**Richard J. STEPHENSON,**
**Plaintiff, Appellee,**

v.

**STAR–KIST CARIBE, INC.,**
**Defendant, Appellant.**

**No. 78–1262.**

United States Court of Appeals,
First Circuit.

Argued Feb. 8, 1979.

Decided May 17, 1979.

---

David Rive Rivera, Hato Rey, P. R., with whom Calderon, Rosa-Silva & Vargas, Hato Rey, P. R., was on brief, for defendant, appellant.

Gustavo A. Gelpi, San Juan, P. R., with whom Feldstein, Gelpi, Hernandez & Castillo, San Juan, P. R., was on brief, for plaintiff, appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and JAMESON, District Judge.*

* Of the District of Montana, sitting by designation.

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiff seaman was injured in the course of his employment aboard the F/V Golden Scarab. Although the vessel was owned by a Canadian corporation, Scarab Fishing Ventures, Ltd., (Scarab), plaintiff brought an action against defendant Star-Kist Caribe, (Star-Kist), for Jones Act negligence, unseaworthiness, and maintenance and cure, alleging Star-Kist to be plaintiff's employer and to have exercised such control over the vessel as to render it liable to him as owner *pro hac vice*.

The district court concluded that under the arrangement between Star-Kist and Scarab Fishing Ventures and the course of conduct followed by the parties in execution of the same,[1] that Star-Kist, through its pervasive control over the financing of Scarab's fishing expeditions, "was able to exercise as effective a control as if it had been [the] owner" and hence was liable for plaintiff's injuries.

The arrangement between Star-Kist and Scarab is set forth in two documents, an agreement for the sale and purchase of fish and a loan agreement. Under the former, Scarab was required to sell to Star-Kist "all yellowfin and skipjack tuna suitable for canning by Star-Kist." The agreement specified the location of the fishing operation (along the coast of West Africa), the port of delivery (one of Star-Kist's African base locations), the sale price, the term of the agreement (from January 9, 1967 to "December 31, 1969 or, at Star-Kist's option, for so long as the vessel is indebted to Star-Kist, whichever is longer"), and the sales procedure for miscellaneous fish caught. Star-Kist agreed to arrange for 1) the necessary fishing license, 2) permission to land fish and operate in Ghana, and 3) the appointment of "ships agents, with Scarab's approval, at the African ports where Star-Kist maintains its bases, to handle and service the 'Golden Scarab.' ". Pursuant to the loan agreement, Star-Kist in effect loaned Scarab $30,000 to be used to discharge specified obligations and opened a revolving line of credit up to $10,000 to cover expenses of the fishing trips incurred at the various African ports. The line of credit was to be paid in full from the proceeds of the next fishing trip. These proceeds were also to be used to pay $15,000 of the $30,000 loan, the balance to be discharged in $3,750 payments from proceeds of each succeeding trip.

Thus, basically, Star-Kist financed the fishing operations of the Golden Scarab. Star-Kist advanced monies to Scarab upon the understanding that the entire production of the ship would be turned over to Star-Kist. But, as the district court noted, Star-Kist's role went beyond that of a mere lender. Star-Kist, keeping a close rein on the funds, also entered into the administration of the expeditions. It made the arrangements for dry-docking, overhauls, provisions of food, equipment, supplies for the vessel, and disbursements to the crew. The basic procedure was for the captain to inform the Star-Kist representative of the supplies needed and he would procure them. When the Golden Scarab unloaded its fish at one of Star-Kist's African stations, Star-Kist would weigh the fish, calculate its value, deduct the amount necessary to pay the various bills which had accumulated, pay the crew in accordance with instructions issued by the captain, retain a portion against Scarab's debt and transmit the remainder, if any, to Scarab.

The district court concluded that through this arrangement Star-Kist "had and did in fact exercise an owner-like control over the F/V Golden Scarab and that whatever legal labels may appropriately fit the existing relationship, the sheer reality was that without the funds, the vessel could not even get under way."

As an additional circumstance warranting, when combined with Star-Kist's financial control, the imposition of liability upon Star-Kist, the court pointed to Star-Kist's role in securing plaintiff's employment

---

1. The parties, by agreement, submitted the case to the district court for trial on the basis of the witnesses' depositions.

aboard the Golden Scarab. A few days after the captain had informed Star-Kist's agent in Tema, Ghana, of his need for a deck boss and a mast man, plaintiff and one Vincent Guarris arrived in Tema. Their air fare was paid by Star-Kist. The court concluded that without Star-Kist's intervention, "neither Guarris nor [plaintiff] would have on their own, flown to Africa to join the Golden Scarab. Thus, directly or indirectly, Star-Kist did participate in [plaintiff's] employment aboard the vessel and, therefore, considering the effective control and interest over the vessel and the outcome of the enterprise, it cannot escape its responsibilities over the welfare of these seamen." The district court further stated that

> "The record is devoid of testimony from which to conclude that before shipping [plaintiff] and Guarris to Africa, Star-Kist advised them of the precarious financial condition of the F/V GOLDEN SCARAB. Neither is there any testimony to show that in accepting employment on that vessel, their sole remedy for unseaworthiness and maintenance and cure would be that which the insolvent shipowner could afford. Seamen are in a sense wards of the Admiralty Courts, and as such the Court is bound to examine with great care, any relation, contractual or otherwise, whereby the rights and remedies of these may result [sic] affected, lessened, eliminated or even placed in jeopardy."

On these bases, the court concluded Star-Kist was liable for plaintiff's injuries. We reverse.

■ Generally, it is the vessel *owner* who, in the ordinary situation, is also the seaman's employer against whom a seaman brings the traditional three count—Jones Act, unseaworthiness, and maintenance and cure—action for personal injuries. Here, however, plaintiff seeks to impose liability on the purported charterer of the vessel, Star-Kist, on the theory that it was Star-Kist, not Scarab, who in reality exercised control and who therefore must be held to an owner's responsibilities. The legal prin-

ciples governing the liability of a charterer of a vessel are well settled.

A demise charterer, one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof for a specified period, is treated as the owner for many purposes and is consequently generally subject to an owner's responsibilities and liabilities. In contrast, a time or voyage charterer contracts not for the vessel itself but for a specific service of the vessel, such as carriage of goods, which is rendered by the owner's master and crew. As the owner does not relinquish exclusive possession and control to the time or voyage charterer, the latter is not subject to an owner's liabilities as is the demise charterer. *Reed v. The Yaka*, 373 U.S. 410, 412, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); *New Orleans-Belize Royal Mail and Central American Steamship Co. v. United States*, 239 U.S. 202, 36 S.Ct. 76, 60 L.Ed. 227 (1915); *United States v. Shea*, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894); *Leary v. United States*, 14 Wall. 607, 610, 20 L.Ed. 756 (1871); *Reed v. United States*, 11 Wall. 591, 600–01, 20 L.Ed. 220 (1870); *Vitozi v. Balboa Shipping Co.*, 163 F.2d 286 (1st Cir. 1947); 2B Benedict, *Admiralty* § 52 (7th ed. 1978); G. Gilmore and C. Black, *The Law of Admiralty* §§ 4–20 to 4–23 (2d ed. 1975); S. Gebb, "The Demise Charter: A Conceptual and Practical Analysis," 49 Tul.L.Rev. 764 (1975).

■ A demise charter is "tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962). Unless the owner completely and exclusively relinquishes "possession, command, and navigation" of the vessel to the charterer, a demise charter is not created. *Id.* at 699, 82 S.Ct. at 1095.

■ The arrangement between Scarab and Star-Kist as manifested by the documents and the course of dealing does not amount to a demise charter and hence Star-Kist is not liable as owner *pro hac vice* for plaintiff's injuries. While we accept the district court's findings of fact we do not attach the same significance to them.

The district court's findings with respect to manning and administration of the vessel do not indicate that Star-Kist exercised "exclusive possession, command and navigation" of the vessel. Authority over the manning of a vessel is an important determinant whether it is the owner or charterer who exercises management and control, since "the presence of an owner's crew on board" is "'very strong presumptive evidence'" that the owner has not in fact put his vessel into the possession of the charterer "which only 'very cogent circumstances' will overthrow." *Hansen v. E. I. DuPont DeNemours & Co.*, 33 F.2d 94, 96 (2d Cir. 1929) (Hand, J.), *see also Reed v. United States*, 11 Wall. 591, 604, 20 L.Ed. 220 (1870); *Shaw v. United States*, 93 U.S. 235, 240, 23 L.Ed. 880 (1876); *New Orleans-Belize Royal Mail and Central American Steamship Co. v. United States*, 239 U.S. at 206, 36 S.Ct. 76; *Fitzgerald v. A. L. Burbank & Co.*, 451 F.2d 670, 676 (2d Cir. 1971); *but see United States v. Shea*, 152 U.S. at 190, 14 S.Ct. 519. While there is evidence, upon which the district court relied, that Star-Kist played a role in manning the vessel, Star-Kist's input was relatively insubstantial. Control clearly remained with the owner.

The first four captains[2] and their crew except for the chief engineer were hired by Mr. Ryall, the president and 51% shareholder of Scarab. The chief engineer, who was in charge of fish refrigeration, had been specifically sent by Star-Kist to join the Golden Scarab. He as well as the captains and some crew left before the departure of the particular voyage on which plaintiff was injured. Though it was late in the season and the prospects for good fishing had passed, Mr. Ryall decided to take command of the vessel himself for a last effort trip. He then hired his own engineer, informed Star-Kist's representative of his need for a mast man and a deck boss, and hired the remainder of the crew. While Captain Ryall described Guarris as having been hired by Star-Kist (and the district court so found) and plaintiff as hired either by Guarris or Star-Kist, on the other hand, Captain Ryall adamantly stated that while he was master he had the sole power to fire any of the crew. This testimony stands uncontradicted. While Star-Kist paid for plaintiff's return flight after his injury, his pay as a crew member, like the pay of the rest of the crew, was based on a share of the catch as determined by Captain Ryall. Thus while Star-Kist may have supplied crew members on request, ultimate control over manning rested with Captain Ryall.

Nor does the district court's finding that Star-Kist paid the crew and Captain Ryall indicate Star-Kist was in control of the vessel. While the word "paid" was used, it is clear from the testimony that Star-Kist provided financing and credit, but did not accept ultimate financial responsibility for the crew's wages. Star-Kist merely disbursed to the crew, in the proportions fixed by the captain, sums later subtracted from amounts owed Scarab on account of the catch.

The district court, with a citation to a portion of the record, also found Star-Kist had the final say over what equipment to buy. At this point, Captain Ryall had responded to the question who made the actual decision what particular equipment to buy: "Star-Kist had the final say because —." He also testified, however, that the captain always recommended what equipment was needed and that Star-Kist never instructed him on the type of equipment to use. It is clear from the evidence taken as a whole that Star-Kist had the final say because of Scarab's precarious financial situation and because Scarab procured its supplies while in foreign ports through Star-Kist representatives, who, as specified in the agreement for the sale and purchase of fish, acted as ships agents. These circumstances do not work significant inroads on Scarab's ultimate control. Nor does the fact that Star-Kist could decide generally where the ship would go (the west coast of Africa) and the mission it would perform

---

2. It is not clear from the evidence whether or not all four captains served during the charter term; Captain Ryall did command during the charter period when plaintiff was injured.

(fishing for skipjack and yellowfin tuna) indicate Star-Kist was in command and control so as to render it liable as owner *pro hac vice.* "[T]he mere fact that the charterer has some control over the master . . [or] selects the routes to be taken or the cargo to be carried does not make him the owner *pro hac vice.*" *Fitzgerald v. A. L. Burbank & Co.,* 451 F.2d at 676; *see also New Orleans-Belize Royal Mail and Central American Steamship Co.,* 239 U.S. 202, 36 S.Ct. 76, 60 L.Ed. 227 (1915).

■ We are left then with Star-Kist's role as a creditor of Scarab.[3] Plaintiff concedes, reply brief at 6, that Star-Kist's status as a creditor of the shipowner, by itself, "would afford no basis for imposing liability." We agree. The test again, as plaintiff recognizes, is one of control.[4] A creditor, to be held liable, "must exercise exclusive actual control over the vessel's operations. That is, either he or his agent must be in charge of the myriad details of operating the vessel, such as engaging the master, hiring the crew, and furnishing the fuel, food and supplies." *Fitzgerald v. A. L. Burbank & Co.,* 451 F.2d at 677. As we have already indicated, Star-Kist's input in the administration of Scarab's fishing operations was insufficient to indicate that it was Star-Kist rather than Scarab which had "possession, command, and navigation" of the vessel. Hence, Star-Kist is not liable as owner *pro hac vice.*

Nor can we conclude that Star-Kist, by virtue of its superior financial position and participation in financing an ailing enterprise combined with its role in securing plaintiff's employment, is rendered liable for plaintiff's injuries. We have examined the cases cited by plaintiff and have found no principle applicable on the circumstances disclosed by the record before us which would justify our piercing the contractual relationship and holding Star-Kist liable as if it were the owner of the vessel.

■ Plaintiff also argues that apart from whether or not Star-Kist was a demise charterer, Star-Kist was his employer and as such is liable under the Jones Act for his injuries. The existence of an employer-employee relationship, a question of fact, must be established by plaintiff. *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949), *reh. denied,* 338 U.S. 839, 70 S.Ct. 32, 94 L.Ed. 513; *Turner v. Wilson Line of Massachusetts,* 242 F.2d 414 (1st Cir. 1957); 2 Norris, *The Law of Seamen* § 670 (3d ed. 1970). The district court made no finding that plaintiff was employed by Star-Kist. The closest it came was that "Star-Kist . . . participate[d] in [plaintiff's] employment aboard the vessel," that it "sought out the men requested by Ryall and arranged to have them transported to Africa," and that "Star-Kist was instrumental in [plaintiff's] employment aboard the F/V Golden Scarab." The present state of the evidence would not support, much less dictate, a finding that plaintiff was an employee of Star-Kist. Plaintiff, in his capacity as a seaman aboard the Golden Scarab, was subject to Ryall's orders, not Star-Kist's, and it was Ryall who determined plaintiff's pay and who had the authority to fire plaintiff. *See Turner v. Wilson Line of Massachusetts,* 242 F.2d at 417. Star-Kist is not liable under the Jones Act.

■ In view of our disposition, the district court's award of attorneys' fees to plaintiff, based on the Puerto Rican obstinancy rule, cannot stand. In any event, the present action, not being based on diversity,

---

3. We point out that Star-Kist was in no manner involved with the inception of Scarab or its vessel; Star-Kist did not finance the construction of the vessel. This was apparently done by the Industrial Development Bank, a bank sponsored by the Canadian government, to whom the vessel was mortgaged.

4. Captain Ryall testified that although he was the president of the company and theoretically was in control "in point of fact, you do not have control, I mean as long as you are indebted. . . . There's always the dollars . . and your actions . . . have to fall in line with . . . their [Star-Kist's] wishes. . . ." While the admittedly marginal nature of Scarab's operations at the time of plaintiff's injury may have contributed to Star-Kist's influence, such is inherent in the debtor-creditor relationship.

the obstinancy rule has no application. *F. F. Instrument Corp. v. Union de Tronquistas de Puerto Rico*, 558 F.2d 607, 610 n. 3 (1st Cir. 1977); *Betancourt v. J. C. Penney Co.*, 554 F.2d 1206, 1209 (1st Cir. 1977).

*Reversed.*