**Irma RODRIGUEZ, et al., Plaintiffs, Appellees,**

v.

**McALLISTER BROTHERS, INC., et al., Defendants, Appellees.**

**Port San Juan Towing Co., Inc., Defendant, Appellant.**

**No. 83–1822.**

United States Court of Appeals, First Circuit.

Argued April 3, 1984.

Decided June 15, 1984.

Jose Antonio Fuste, Hato Rey, P.R., with whom J. Ramon Rivera Morales, and Jime-nez & Fuste, Hato Rey, P.R., were on brief, for defendant, appellant.

Harvey B. Nachman, Santurce, P.R., with whom Maria H. Sandoval and Law Offices of Nachman & Fernandez-Sein, Santurce, P.R., were on brief, for Irma Rodriguez, et al.

Before BOWNES and ALDRICH, Circuit Judges, and HUNTER,[*] Senior District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

Plaintiffs, the personal representatives of Angel Luis Valle, deceased, seek to recover from defendant Port San Juan Towing Co., Inc. (Port) for his wrongful death while on board the tug JUSTINE McALLISTER (JUSTINE). The JUSTINE was engaged in a towing operation for Port. The case was tried to the court on the admiralty side, which, after a recital of findings, ruled against defendant, who now appeals.[1] We reverse.

The facts are somewhat complex. McAllister Brothers, Inc. is the owner of a number of tugboats, including JUSTINE. It owns several subsidiary corporations, including Port, and South Coast Towing Corp., Inc. (South Coast). It bareboat charters tugboats, including JUSTINE, to South Coast, and a number of others to Port. Port is engaged in San Juan Harbor tugboat operations, and South Coast in offshore towing, but, on busy occasions, if Port lacks sufficient vessels, it makes short-term arrangements, in a manner to be described, with South Coast.

For the early morning hours on the day in question Port had arranged with South Coast to have JUSTINE render it tugboat service in moving a grain freighter from one location in San Juan Harbor to another. During the operation a bullnose cleat, to which the towline was attached, broke loose. The line snapped back, causing the

---

[*] Of the Western District of Missouri, sitting by designation.

[1]. Another defendant, McAllister Brothers, Inc., was found not liable, a finding which plaintiff does not appeal.

cleat to strike Valle with such force that it killed him. The court found that on a prior occasion a Port employee had supervised an improper welding of the cleat, which rendered the vessel unseaworthy, and that at the time in question JUSTINE's improper maneuvering had put an excessive strain on the line, causing the weld to let go. The court held for plaintiffs, both on a finding that JUSTINE was unseaworthy, and on the basis of negligence in installing the cleat and in maneuvering the vessel.

South Coast and Port both were insured under the Puerto Rico Workman's Compensation Act, and full compensation was paid by virtue of South Coast's insurance. The district court found, however, that Port was the one responsible for the death and held that it was not protected by its insurance as it did not cover Valle, and that it was not protected by South Coast's policy. Hence, although the ship was covered two ways, and compensation was paid, Port was held individually liable in addition.

■ Under settled principles of admiralty law, liability for unseaworthiness, or negligence in maneuvering, turns upon who possessed control of the ship such that it could best be charged as the owner at the time the accident occurred. In this case that designation depends upon whether Port's enlistment of South Coast's tug should be characterized as a contract, or a time charter, or as a demise charter. *Cf. Stephenson v. Star-Kist Caribe, Inc.,* 598 F.2d 676, 679–80 (1st Cir.1979). The court found the arrangement a demise charter. It said,

"The defendant Port San Juan Towing claims first that it had no legal obligation whatsoever towards Mr. Valle, on the theory that Port San Juan Towing was, at most, a time charterer of the tugboat, without the responsibilities of ownership. It appears to the court however that during the periods in which it was using the tugboat Port San Juan had all the attributes of custody and control of the vessel including, most importantly, the hiring and control of the temporary captain and crew. The completeness of con-

trol over the operation of the vessel distinguishes this case from those cases in which an attempt to place liability was rejected. See, for example *Stephenson v. Star Kist Caribe, Inc.,* 598 F.2d 676 (1st Cir.1979). For this reason the Court finds that, barring another ground for immunity, Port San Juan had the normal obligation of an owner to exercise reasonable care to all persons who were on board for legitimate reasons. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632 [79 S.Ct. 406, 410, 3 L.Ed.2d 550] (1959)."

In order to test the correctness of this, we recite the facts in more detail. Harbor tug procedures require a crew of three. JUSTINE, an ocean-going tug, for sea voyages carried a crew of eight. The harbor engagement that morning was for a short period, and, as soon as it terminated, JUSTINE was to go to sea. Accordingly, her full crew was aboard, to be ready to sail. All eight members were being paid by South Coast, and three, in addition, selected by South Coast to handle the towing operation, were paid what was called overtime by Port, pursuant to the industry collective bargaining contract covering all workers. Valle was not one of the three, but was standing on deck, drinking his early morning coffee, when struck by the cleat.

■ In the absence of a writing, a demise charter requires showing essentially a change in ownership, a complete relinquishment of "possession, command and navigation," as, it happens, plaintiffs' counsel well knows. *Guzman v. Pichirilo,* 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). The *Guzman* Court pointed out, ante, at 700, 82 S.Ct. at 1096, "[C]ourts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship." The fact that, mechanically, Port paid the crew, is not determinative. *See Stephenson,* ante, 598 F.2d at 680. Actually, in a very real sense, the three men working were not Port's crew at all. They were hired by South Coast; they were selected out of the

eight on board by South Coast, and their basic wage was being paid by South Coast. All that Port did was to pay a bonus. It was a matter of indifference to Port whether this was paid direct, or included in its lump sum payment for the hire of the vessel's services. No employee of Port was on board to supervise or to give directions. The court's finding that Port was "hiring and controlling" these men is a conclusion we cannot accept.

■ The claim that Port took over exclusive possession of the vessel is further belied by the very fact that Valle and the four others of South Coast's crew who were of no conceivable interest to Port, remained on board. Plaintiffs repeatedly assert that Valle "was not working at all when he died," but, so far as the vessel was concerned, it is indisputable that he was presently employed on his "20 days on, ..." The record further shows that when such hires occurred at a later hour of the day, viz., during normal working hours, the seamen who were not actively handling the vessel attended to maintenance, and other tasks, of no concern to Port. Manifestly, Valle was part of South Coast's crew, regardless of the fact that he "was not working."

This fact is an additional reason for not distinguishing *Stephenson*. We there, in speaking of "exclusive possession, command and navigation" of the vessel, quoted, 598 F.2d, ante, at 680, from *Hansen v. E.I. DuPont DeNemours & Co.*, 33 F.2d 94, 96 (2d Cir.1929),

> "[T]he presence of an owner's crew on board" is " 'very strong presumptive evidence' " that the owner has not in fact put his vessel into the possession of the charterer "which only 'very cogent circumstances' will overthrow."

There were no such circumstances here. Change of "ownership" is a matter of substance, and of moment. The hiring of the vessel here was for a specific job, lasting, apart from waiting to start, only three quarters of an hour. Apparently, such hirings sometimes occurred several times a month. It is particularly unlikely that on each occasion the parties contemplated that Port completely took over the vessel, and assumed an ownership type of responsibility for employees that it had not selected, and for the unseaworthiness of a vessel with which it had such an ephemeral connection. Rather, even if there were not *Guzman*'s presumption, ante, this would seem a classic case of a non-demise charter, if, in fact, it could be considered a charter at all.

We deal briefly with the court's charging Port with liability because the "defective installation of the bullnose was done [some months previously] under the supervision of an employee of Port San Juan Towing." This finding was clearly erroneous. The cleat previously broke off, and was repaired, when JUSTINE, basically South Coast's vessel, was doing South Coast work, in charge of South Coast's captain, who, for good measure, testified he was not being paid by Port. The cleat was installed under the supervision of a "Mr. Sigi," who was the port engineer for South Coast, Port, and "all of the McAllister companies." Clearly he was not then acting for Port. Charging Port for this action was not only a violation of the liability claims specified before trial, but was substantively unsupported.

This holding makes it unnecessary to discuss plaintiffs' argument that Port could not rely on South Coast's insurance unless it had affirmatively required, as part of its contract, that South Coast carry such. *But cf. Lugo Sanchez v. Puerto Rico Water Resources Authority*, 105 D.P.R. 1198, 1206 (1977).

The complaint is to be dismissed.