**Oscar MATUTE, Appellant,**

v.

**LLOYD BERMUDA LINES, LTD., or similar name; and Trans–Mar Agencies, Inc.**

No. 90–6002.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6)

April 9, 1991.

Filed April 25, 1991.

As Amended May 24, 1991.

Francis J. Dooley, Orange, N.J., for appellant.

Mark F. Muller, Freehill, Hogan & Mahar, New York City, for appellees.

Before STAPLETON, COWEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Plaintiff Oscar Matute, a Honduran injured while serving as a crewman on the cargo liner THE LLOYD BERMUDA, filed suit under the Jones Act and general maritime law against the ship's exclusive charterer, Lloyd Bermuda Lines (LBL), a Bermudan corporation which does business in New Jersey, and its United States agent, Trans–Mar Agencies (TMA). Matute alleged in his complaint that the defendants breached their duty to provide him with proper medical attention when Matute developed an eye injury while serving on THE LLOYD BERMUDA. From Matute's complaint and briefs, it appears that he attempts to impose liability on the defendants by casting them as, alternatively, the owner-in-fact of the ship, the employer-in-fact of Matute, and/or the owner's agent responsible for procuring Matute's medical care.[1] After five months of discovery, the district court granted the defendants' motion for summary judgment, finding that, as the ship's time charterers, the defendants owed no such duties to Matute, but that Matute's only remedy rested with the ship's owners. We affirm.

### I.

The facts, viewed in the light most favorable to the non-moving party, Matute, are as follows. The defendant Lloyd Bermuda Lines (LBL) is a Bermudan corporation with its chief officer John Kearns residing in New Jersey. LBL time chartered the cargo ship THE LLOYD BERMUDA from its owner, Procoast Navigation (Procoast), a German corporation, beginning June 9, 1983 until the ship's sinking in December 1988. During this period, the ship made weekly sailing trips from Port Newark, New Jersey to Hamilton, Bermuda. The defendant Trans–Mar Agencies (TMA), a New Jersey corporation, is LBL's general agent in the United States.

Under the time charter agreement between LBL and Procoast, LBL received the right to use the cargo hold of the LLOYD BERMUDA to ship goods to destinations chosen by LBL. Procoast, however, retained the responsibility for condition of the ship and control over its crew. LBL paid a flat rate of $2000 per day (later $1800) for use of the ship, which was to be provided by its owner in a condition ready to receive and transport cargo. Procoast hired the captain of the ship and, through the captain, the ship's crew. In addition, Procoast, the owner had the duty "to provide and pay for all provisions [and] wages ... of the Crew." The charterer forwarded money for the charter hire once a month to Procoast's representative in Miami Florida, Ingo Folling. There is no evidence in the record disputing that the relationship between the owners and the charterer as delineated by the time charter agreement was not the relationship-in-fact between these parties.

TMA performed various functions as LBL's agent in the operation of the shipping line. It would obtain crewmembers' U.S. immigration visas, meet arriving crew at the Newark airport and arrange and pay for transportation to the port, and make advances to pay for certain expenses of the ship and crew while docked in New Jersey, the amounts to be deducted from Procoast's monthly charter hire fee (plus 2½% commission). TMA would occasionally assist with the repatriation of foreign crewmen returning to their countries, by preparing immigration documents and making the necessary travel arrangements.

---

**1.** The United States Court for the District of New Jersey assumed jurisdiction over Matute's action under 46 U.S.C.App. § 688 (The Jones Act) and general admiralty jurisdiction. Although the district court did not discuss this issue and it was not raised by the parties, Jones Act jurisdiction exists here because there are sufficient contacts between this litigation and the United States. General admiralty jurisdiction is present here because this case involves

an injury arising out of the operation of a vessel on navigable waters. The parties agreed, and the district court assumed, that American law properly applied to this cause of action because, generally, American admiralty courts will apply American law unless a party pleads and proves the applicability of foreign law.

This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Matute does not dispute that Procoast's captain hired him. The captain sent Matute a letter on August 29, 1986, confirming his employment on the ship. That letter, however, was drafted on TMA stationery. Upon Matute's arrival at Newark Airport, TMA arranged and paid for his transport to the ship.

Matute began his job as an oiler in the engine room of the LLOYD BERMUDA in early September, 1986, but on his second voyage from Newark to Bermuda developed an irritation in his right eye. He complained to the ship's captain and first aid officer but they did not secure medical attention for Matute. While the ship was docked in Newark, Matute also complained of his eye problem to Jose Planas, a representative of TMA whose job it was to come aboard the ship to inquire about the well-being of the crew members and to determine whether they needed anything. Finally, on October 27, 1986, when the ship was docked in Bermuda, the ship's captain made arrangements for Matute to see an eye doctor who was unable to help Matute's eye condition which by that time had progressed to near blindness in his right eye. Three days later when the ship was back in Newark, Jose Planas came aboard the ship and told Matute that he was taking him to see a doctor in New York City. That doctor concluded that "the vision of his right eye cannot be improved at this time due to scar tissue in the retina of indeterminate cause," but that Matute could continue working as long as he wore protective eye glasses.

On November 6, 1986, the ship's captain told Matute that they could not use him anymore. After Matute's termination, TMA purchased an airline ticket and obtained the necessary immigration documents for his return to Honduras. According to Matute's affidavit, Matute thought he worked for TMA because, in the language of his affidavit, "all my communications, every document and letters, all my arrangements for joining the ship, for leaving the ship and for my airline ticket was made by Trans-Mar."

On December 28, 1988, THE LLOYD BERMUDA sank in the North Atlantic Ocean during heavy weather; only 3 of the 11 crewmembers were rescued. Curiously, both the U.S. Coast Guard Report of the accident and the insurance claim forms list the defendant TMA as the "agent" of the owner Procoast. An employee and a manager of TMA both deny that TMA was ever an agent of Procoast; both contend that TMA is the general agent of LBL. The president of Procoast also denies that TMA has ever been an agent of Procoast.

In July 1987 Matute originally filed a complaint under the Jones Act against Procoast for damages arising out of the injury to his eye. In its answer, Procoast admitted to being the owner of THE LLOYD BERMUDA. The district court dismissed that action for lack of subject matter jurisdiction and this court affirmed. See Matute v. Procoast Navigation Ltd., 928 F.2d 627 (3rd Cir.1991).

In October 1989, Matute filed a separate complaint under the Jones Act and maritime law against LBL and TMA as agents-in-fact for the owner of the ship. It is this action which is the genesis of this appeal. The defendants subsequently filed a motion for dismissal or alternatively for summary judgment, and Matute filed a counter motion requesting additional discovery.

The district court granted the defendants' motion for summary judgment, denied their request for sanctions against Matute's counsel, and denied the plaintiff's request for additional discovery. Considering the uncontested facts in the record, the district court found that the limited services which LBL supplied to Matute through TMA did not transform LBL or TMA's status into that of Matute's employer or owner of the vessel. The court stated, "The incidental role Trans-Mar played in facilitating Matute's transportation to and from the vessel and in securing medical care is hardly indicative of the complete control Trans-Mar would have had to have exercised in order to establish an employer/employee relationship and, as indicated, summary judgment will be granted in defendants' favor."

The court also found that the four months provided Matute's counsel for discovery in this case were adequate and refused to grant additional time for discovery. Finally, in denying the defendants' request for Rule 11 sanctions, the court, although "troubled" by Matute's filing of this complaint, was unprepared "to say that this action was entirely frivolous."

On appeal, the primary issue raised by Matute is whether or not a genuine disputed issue of fact exists concerning the liability of Lloyd Bermuda Lines, Inc., and Trans–Mar Agencies for the injury sustained by Matute while serving aboard the vessel.

## II.

█ Under long-settled maritime law, charterers of seagoing vessels ordinarily are not liable for providing "cure and maintenance" to seamen who are injured aboard the chartered vessel. Such liability rests with the owner of the vessel who is normally responsible for the navigation of the ship and the work and welfare of the crew. Matute advanced three theories before the district court that his case falls within one of the recognized exceptions to this general rule: 1) that the defendants here exercised such control that they constituted owners *pro hac vice* [2] of the ship; 2) that, although not the owners, the defendants acted as the *employer* of Matute; and 3) that the defendants, as agents of the owner, negligently failed to exercise their duty to provide Matute with proper medical care. The district court rejected all three arguments. This court exercises plenary review over the trial court's grant of summary judgment to the defendants, viewing the evidence in the record in the light most favorable to Matute.

### A. WHETHER OR NOT THE DEFENDANTS WERE OWNERS *PRO HAC VICE* OF THE SHIP.

█ Charterers of seagoing vessels may acquire the status of owners *pro hac*

*vice* where they take control of the vessel under a "demise charter" agreement. A "demise charterer," one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof is treated as the owner for many purposes and is subject to an owner's liabilities such as "maintenance and cure" of the crew. In contrast, a "time charterer" contracts not for the vessel itself but for a specific service of the vessel, such as the transport of goods, which is rendered by the owners' ship, captain, and crew. As such, the time charterer is not subject to the traditional owner's maritime liability of "maintenance and cure." *See Stephenson v. Star–Kist Caribe, Inc.*, 598 F.2d 676, 679 (1st Cir.1979); *Aird v. Weyerhaeuser S.S. Co.*, 169 F.2d 606, 609–10 (3d Cir.1948), *cert. denied*, 337 U.S. 959, 69 S.Ct. 1521, 93 L.Ed. 1758 (1949); *see also* 95 A.L.R.Fed. 636 (1989).

█ Here, the relationship between the defendants and the shipowner Procoast is not that of a "demise charterer" or owner *pro hac vice*. The contractual relationship was a "time charter" in name and in fact. The Agreement between the owner and the charterer was entitled a "Time Charter." Under its provisions, Procoast was to bear the responsibility for and control over the vessel, the captain and the crew, including their hiring and firing. Courts are hesitant to imply a relinquishment of possession and control by the owner of a ship absent the most explicit language indicating that the owner completely and exclusively gives up "possession, command, and navigation" of the vessel to the charterer. *Guzman v. Pichirilo*, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962). Here, there simply is no evidence of such a relinquishment by Procoast.

### B. WHETHER OR NOT THE DEFENDANTS WERE THE EMPLOYER OF MATUTE.

█ The Jones Act provides seamen a suit for damages against employers for

---

**2.** This court earlier explained the phrase "owner pro hac vice" to indicate one who "stands in the place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel." *Aird v. Weyerhaeuser S.S. Co.*, 169 F.2d 606, 610 (3d Cir.1948), *cert. denied*, 337 U.S. 959, 69 S.Ct. 1521, 93 L.Ed. 1758 (1949).

injuries incurred while at sea, and the plaintiff must establish an employment relationship to recover under the Act. *Volyrakis v. M/V Isabelle*, 668 F.2d 863, 865 (5th Cir.1982); *Armit v. Loveland*, 115 F.2d 308, 313 (3d Cir.1940). Ordinarily, the shipowner is also the employer of the seamen. The employer, however, need not be the owner of the vessel. *Volyrakis*, 668 F.2d at 865. The existence of an employer-employee relationship is a question of fact; the critical inquiry turns on the degree of control exercised over the crewman. Factors indicating control over the seaman include payment, direction, and supervision. Also relevant is the source of the power to hire and fire. *Id.* at 866. Thus, in *Stephenson*, the court concluded that the charterer of a fishing boat, although it hired some of the crew and provided financing for the boat's fishing business, nevertheless was not the employer of the crew because the seamen were still subject to the orders of the owner's captain, who determined the crew's pay and had the authority to fire them. *Stephenson*, 598 F.2d at 681.

■ Matute relies upon the following evidence to establish an employment relationship between Matute and the defendants: the letter guaranteeing Matute employment, though signed by the ship's captain, was written on TMA stationery; TMA arranged and paid for Matute's transport from Newark airport to the vessel; TMA's representative, Jose Planas, came aboard the vessel each time it was docked in Newark to inquire as to the well-being of the crewmen; Planas arranged for Matute's visit to the eye doctor in New York City; after Matute's discharge by the ship's captain, TMA arranged and paid for Matute's return trip to Honduras. The charterer was not, however, ultimately responsible for these payments and, under the terms of the time charter, would be reimbursed by the owner plus a 2½% commission.

The services provided by LBL through TMA did not involve the control, direction, and supervision over Matute necessary to constitute an employer-employee relationship. The owner Procoast, through the ship's captain, hired Matute and eventually terminated him. It set the amount of Matute's wages and was responsible for paying him. The captain supervised Matute in his position as oiler. Despite Matute's assertion in his affidavit that he believed he worked for TMA, that conclusion is not supported by evidence in the record. The district court correctly found that "the limited services which LBL supplied to Matute through [TMA] did not transform LBL or TMA's status over him in to that of an employer."[3]

## C. WHETHER OR NOT THE DEFENDANTS, ACTING AS AGENTS OF PROCOAST, NEGLIGENTLY FAILED TO OBTAIN MEDICAL ATTENTION FOR MATUTE.

■ The final legal basis for liability advanced by Matute was that the defendants, acting as agents of Procoast, negligently failed to obtain reasonable, prompt medical attention for the injured Matute. As such, Matute urges that the defendants should be held liable for their own tort against Matute. Although not an owner or employer of the seamen, a time charterer may still be liable to an injured seaman if it is negligent in handling its responsibilities as a time charterer. *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 647 (5th Cir. 1989). For example, if a time charterer were to negligently choose goods for transport which, when placed alongside each other in the ship's hold, caused an explosion, the time charterer may be liable in tort or contract to the ship's injured seamen. Of course, to recover the plaintiff

---

**3.** In an eleventh-hour motion to stay the determination of this appeal, Matute's counsel endeavored to submit evidence that TMA made additional direct payments to the crew of the LLOYD BERMUDA for loading and securing the cargo. Even if we were to allow this late evidence and accept it as true, it would not alter our conclusion that LBL and TMA are not liable under the Jones Act. Assuming TMA created a temporary employment relationship created by paying the crew for securing cargo, that relationship was terminated once the cargo was loaded and secured. Matute alleges no injury sustained during the loading of cargo and therefore can find no support from this additional evidence.

must first identify a *duty* owed which was breached by the time charterer. This, of course, is no special rule of maritime law but an application of ordinary tort principles.

Here, Matute seems to argue that LBL through TMA owed an affirmative duty to provide Matute proper medical care and failed to do so. Thus, according to the plaintiff, TMA's representative, Jose Planas, acted negligently when he failed to obtain proper medical attention for Matute until the eye condition had worsened considerably. Liability for negligence, however, can never arise absent some duty. It is clear from the time charter agreement between Procoast and LBL that, although TMA could advance funds to aid the ship and its crew while in port, it could do so only at the direction of the Captain. There was no affirmative duty upon TMA's representative to provide Matute medical care as long as the ship's captain did not so order. The time charter provides:

> Cash for the vessel's ordinary disbursements at any port may be advanced *as required by the Captain*, by the Charterers or their agents subject to 2½% commission and such advances shall be deducted from hire. (Emphasis supplied).

Matute's fate was solidly, and perhaps unfortunately, in the hands of his Captain, Procoast's agent. Matute does not allege any negligence by TMA in the course of carrying out its duties specified in the time charter agreement.

Matute purports to find support for his theory that TMA was an agent of Procoast from two government reports, the Coast Guard's report of the LLOYD BERMUDA'S sinking and the insurance claim forms. Both reports list TMA as the "agent" of Procoast. Although admittedly unexplained and anomalous when all responsible parties vigorously deny such a relationship, these two references do not appear to add up to the conclusion urged by Matute. Even if "agents" of Procoast for certain purposes, Matute can point to no "duty" breached by TMA to give rise to tort liability. No evidence in the record supports the conclusion that TMA, whether an agent for some purposes or not, had the particular responsibility to provide medical care for injured seamen.

Neither TMA nor its representative was negligent in carrying out a duty owed to Matute. TMA acted as general agent for the time charterer of Procoast's vessel; there is no evidence of anything more. TMA did not owe Matute a duty to secure him prompt, adequate medical attention, absent an order by the Captain and TMA never represented to Matute that it would undertake such a duty.

### III.

This court must affirm the district court's refusal to grant Matute an extension for additional discovery unless the district court abused its discretion. In denying Matute's motion, the court stated,

> This Court has already provided Matute and his counsel with over *four months* since the filing of [the summary judgment] motion to conduct discovery, which discovery has, in fact, been conducted. Matute has already deposed the Chief corporate officers at both LBL and Trans–Mar and collected 100 pages of deposition transcripts and exhibits. Matute has thus had ample time to prove the links he seeks to establish, and has failed to do so.

It appears from Matute's brief that, if given additional time, he would seek to depose Jose Planas. It is far from clear, however, how the deposition of this witness would further support Matute's action. The most that Matute alleges about Planas is that he was closely involved with Matute and the ship. Even if true, it would not render LBL or TMA the *employer* of Matute or supply the affirmative duty to Matute which was allegedly breached. As Matute has had adequate time for discovery and does not identify any additional fruitful purpose for an extension of time, the district court appears not to have abused its discretion in denying Matute's motion.

## IV.

The defendants ask this court to award costs, expenses, and attorneys fees against Matute pursuant to 28 U.S.C. § 1927 and Federal Rule of Appellate Procedure 38. The defendants maintain this is a frivolous appeal. The district court denied the defendants' application for Rule 11 sanctions below, stating that, although troubling, Matute's action was not entirely frivolous. We agree.

## V.

The judgment of the district court granting defendants' motion for summary judgment and denying appellant's motion for additional discovery will be affirmed. The defendants' request for sanctions against appellant's counsel under Appellate Rule 38 will be denied.

Each side to bear its own costs.