The Court having reviewed the submissions of the parties; and

The Court having heard oral argument on April 15, 1999 on the motion;

**IT IS** on this *9th* day of June, 1999 hereby

**ORDERED** that intervening counterclaim defendants' request that the Court take judicial notice of the filing of Map 1037–3, later recorded as PWD D9–1330–T77, on March 17, 1977 is **GRANTED**; and

**IT IS FURTHER ORDERED** that intervening counterclaim defendants' request that the Court admit the April 4, 1977 order of this Court and the Pallme letter for their truth is **GRANTED**; and

**IT IS FURTHER ORDERED** that intervening counterclaim defendants' request that the Court admit the Finucan certificate for its truth is **DENIED** and that the Finucan certificate will be admitted only as evidence of Finucan's state of mind at the time the certificate was drafted; and

**IT IS FURTHER ORDERED** that intervening counterclaim defendants will bear the burden of proving that the limitations period has run on the beach easement issue raised in the Stillmans' counterclaim, including the burden of proving when the parties to the *Harthman* action had actual notice of PWD D9–1330–T77; and

**IT IS FURTHER ORDERED** that the Finucan certificate of service does not raise a presumption of valid service.

**UNITED STATES of America and Government of the Virgin Islands, Plaintiffs,**

v.

**WEST INDIES TRANSPORT CO., INC., Wit Equipment Co., Inc., and W. James Oelsner, Defendants.**

**Witwater Corporation, Petitioner,**

v.

**Michael E. Murphy, in his capacity as Area Port Director for the United States Customs Service, Respondent.**

No. CRIM. A. 93–195(STX).

No. CIV. A. 98–104(STT).

District Court, Virgin Islands,
D. St. Croix,
D.St. Thomas and St. John.

July 19, 1999.

James A. Hurd, Jr., United States Attorney, Curtis V. Gomez, Assistant U.S. Attorney, Federal Building & U.S. Court-house, St. Thomas, VI, for U.S., Respondent Michael E. Murphy.

Treston E. Moore, Moore & Dodson, St. Thomas, VI, for Defendant W. James Oelsner.

Andrew C. Simpson, Bryant White & Barnes, P.C., St. Croix, VI, for Petitioner Witwater Corporation.

## OPINION ON DEFENDANTS' MOTION TO QUASH AND OPPOSITION TO WRIT OF EXECUTION

## OPINION ON MOTION OF WITWATER CORPORATION TO STAY OR QUASH EXECUTION OF WRIT

## OPINION ON PETITION FOR ORDER OF MANDAMUS

BROTMAN, District Judge.

Presently before the Court are the following motions: (1) a motion filed by W. James Oelsner ("Oelsner") on behalf of all of the defendants to Criminal Action No. 93–195 to quash the writ of execution filed by the United States in that action; (2) a motion filed by Witwater Corporation ("Witwater") to stay or quash the writ of execution filed by the United States in Criminal Action No. 93–195; and (3) a petition for order of mandamus filed by Witwater in Civil Action No. 98–104.

## I. FACTS AND PROCEDURAL BACKGROUND

On March 26, 1996, this Court entered a judgment against Oelsner ("Oelsner Judgment")[1] which imposed a prison sentence and required Oelsner to pay $1,440,450.00 in restitution[2] and $95,500 in fines. *See*

1. The jury found Oelsner guilty of the following offenses: (1) violation of the Clean Water Act, 33 U.S.C. § 1311(a), 33 U.S.C. § 1319(c)(2)(A), 18 U.S.C. § 2; (2) violation of the Rivers and Harbor Act, 33 U.S.C. § 403, 33 U.S.C. § 406; (3) violation of the Ocean Dumping Act, 33 U.S.C. § 1411(a)(1), 33 U.S.C. § 1415(b)(1), 18 U.S.C. § 2; (4) conspiracy to defraud the United States, 26 U.S.C. § 86(a)(3)(1)(A); and (5) fraud, misuse

of visas, 18 U.S.C. § 2, 18 U.S.C. § 1546. *See* United States' Opp'n, Attach. 2.

2. With regard to the amount of restitution Oelsner was required to pay, the judgment stated as follows:

The defendant shall pay restitution within Sixty (60) days from today's date provided, however, that if the costs of these cleanup efforts are less than the amount to which

Opp'n of the United States to the Emergency Mot. of Witwater Corporation to Intervene and to Stay or Quash Execution ("United States' Opposition"), Attach. 2. Also on March 26, 1996, this Court issued criminal judgments against West Indies Transport, Inc. ("West Indies") and WIT Equipment Co., Inc. ("WIT Equipment") in the same matter.[3] All three judgments contained identical lists of vessels and real estate that the Court determined were subject to liens. *See id.* Included in the list was the vessel Wittug. *See id.*

On April 16, 1996, the United States recorded a lien against the Wittug at the Recorder of Deeds, Division of St. Croix to satisfy the $1,440,450.00 judgment previously entered against Oelsner. *See id.,* Attach. 3. On November 9, 1998, the United States applied for a writ of execution on the Oelsner Judgment against the Wittug, serving Oelsner with a copy of the application by mail on November 10, 1998. Also on November 9, 1998, Witwater filed an emergency motion to intervene and to stay or quash execution of the writ. On November 12, 1998, this Court issued the writ. On November 23, 1998, Oelsner filed a motion to quash the writ of execution and to obtain a hearing on the matter.[4]

In addition to attempting to intervene in the United States' case against Oelsner, Witwater filed its own action regarding the Wittug. On May 22, 1998, Witwater filed a petition for order of mandamus, alleging that it owns the Wittug and that the United States Customs Service has wrongfully denied the Wittug clearance to depart St. Thomas, USVI where it is currently docked. *See* Pet. for Order of Mandamus, ¶¶ 6, 7, 9, 17. On August 7, 1998, the United States filed a motion to dismiss the petition, arguing that the Court lacked jurisdiction to issue an order of mandamus in such an action and that Witwater failed to exhaust its administrative remedies before filing the petition. On November 10, 1998, the Court heard argument on this motion and ordered that the hearing transcript be made part of the criminal action pending against Oelsner as well as part of the mandamus action Witwater initiated.

On December 16, 1998, the Court granted Oelsner's motion for a hearing on the writ of execution, permitting Witwater to intervene in the hearing for the limited purpose of challenging the writ. *See United States v. West Indies Transport Co., Inc.,* 35 F.Supp.2d 450, 455, 458 (D.V.I. 1998). The Court stated that the hearing would be held for the purpose of determining the identity of the Wittug's owner, the value of the Wittug, and the cost of the remediation that remains to be done. *See id.* at 454, 458. At the same time, the Court denied the United States' motion to dismiss the petition for order of mandamus filed by Witwater in Civil Action No. 98–104. *See id.* at 457–58. Finally, the Court consolidated Criminal Action No. 93–195 and Civil Action No. 98–104 to the extent that the hearing on the writ would be a joint hearing on the question of the ownership of the Wittug. *See id.* at 458–59.

The hearing was held on April 19, 1999 at the U.S. Attorney's Office in St. Croix, USVI. Oelsner appeared at the hearing via satellite transmission. On May 10, 1999,

---

the Court made reference of $1,440,450.00, credit will be given to the defendants to that extent.
Any restitution payments made by defendants West Indies Transport, Inc. and/or WIT Equipment Co., Inc. shall be applied to reduce this amount accordingly.
United States' Opp'n, Attach. 2.

**3.** The Court ordered West Indies to pay $3,520,500.00 in fines and $1,440,450.00 in restitution. The Court ordered WIT Equipment to pay $1,520,500.00 in fines and $1,440,450.00 in restitution. In both the West Indies and the WIT Equipment judgments, the Court stated that any restitution payments made either by the company not subject to the judgment or by Oelsner would be applied to reduce the amount of restitution owed by the company subject to the judgment.

**4.** Oelsner alone brought the motion to quash and to obtain a hearing, stating that the other corporate defendants are defunct. *See* Defs.' Mot. to Quash at 1, n.1.

Oelsner filed a memorandum in support of his motion to reduce restitution.[5] *See* April 19, 1999 Hr'g Tr. at 104, 148 (giving parties leave to file post-hearing briefs clarifying the issues addressed at the hearing).

## II. *DISCUSSION*

### A. **REQUEST FOR RESTITUTION REDUCTION**

Oelsner has asked the Court to reduce the amount of restitution that is due and owing. *See* Defs.' Mot. to Quash, ¶ 5; Def. Oelsner's Mem. in Supp. of his Mot. to Reduce Restitution. The Oelsner Judgment indicates that "if the costs of [the United States'] cleanup efforts are less than the [restitution] amount to which the Court made reference of $1,440,450.00, credit will be given to the defendants to that extent." United States' Opp'n, Attach. 2. The Act prohibits the use of a writ to execute judgment on property that exceeds in value the aggregate amount of the judgment. *See* 28 U.S.C.A. § 3203(c)(2)(B)(i) (West 1994).

At the April 19, 1999 hearing, the Court permitted Oelsner to introduce evidence regarding the cost of the remediation that has been done and that remains to be done. The parties agreed that Oelsner has spent $50,000 to date removing six vessels, specifically the Witislander, the Witrollon, the Waterhaul, the Witbarge III, the Witbarge II, and the Witbridge. *See* Def.'s Ex. 49; April 19, 1999 Hr'g Tr. at 24. Oelsner testified that he has spent an additional $20,000 to date preparing two additional vessels for removal, specifically the M/V Mar and the Witdock. *See* April 19, 1999 Hr'g Tr. at 47. Oelsner predicted that the remaining remediation will cost approximately $32,000. *See* Def. Oelsner's Mem. in Supp. of his Mot. to Reduce Restitution at 9. The United States disputes this figure. *See* April 19, 1999 Hr'g Tr. at 90–91 (Commander Brian Salerno, Com-

manding Officer of the Coast Guard Marin Safety Office in San Juan, Puerto Rico, testifying that it would cost more than $40,000 to "accomplish the type of clean up contemplated by the site assessment for the motor vehicle Mar and the WIT Dock"). In addition, the United States points out that Oelsner has failed to account for two vessels which he was required to remove: the Witconcrete II and the Witcargo. *See id.* at 53–56; Def.'s Ex. 22. According to Oelsner, the Army Corps of Engineers removed the Witconcrete II; Oelsner has not reimbursed the Army Corps of Engineers for the expense it incurred in removing the vessel. *See* April 19, 1999 Hr'g Tr. at 54–55. Oelsner also testified that the Witcargo has not been removed. *See id.* at 55.

Because there is uncertainty surrounding the cost of the remediation that remains to be done, the Court will presently decline to reduce the amount of restitution that is due and owing. Once the clean-up is complete, Oelsner may move the Court to reduce the restitution amount indicated in the Oelsner judgment. Until that time, the amount will not be reduced.

### B. **MOTIONS TO QUASH THE WRIT OF EXECUTION**

 Both Oelsner and Witwater challenge the United States' right to execute judgment on the Wittug. They argue that Witwater, not Oelsner, is the owner of the vessel. The United States filed an application for a writ of execution pursuant to the Federal Debt Collection Procedures Act of 1990 ("FDCPA") which permits the United States, as a judgment creditor, to levy pursuant to a writ of execution upon "[a]ll property in which the judgment debtor has a substantial nonexempt interest." 28 U.S.C. § 3203(a) (West 1994). A writ of execution may be challenged by an individual or entity claiming an ownership interest in the property. *See United States v. Coluccio*, 842 F.Supp. 663, 665 (E.D.N.Y.

---

5. Oelsner initially requested that the Court reduce the amount of restitution stated in the

Oelsner Judgment in the motion to quash the writ of execution.

1994) (resolving a challenge to a writ of execution issued pursuant to the FDCPA where ownership of the subject property was in dispute), *vacated on other grounds,* 51 F.3d 337 (2nd Cir.1995). In such a situation, the burden of proving ownership of the subject property is borne by the claimant, not the judgment creditor. *See id.* (analogizing to civil forfeiture laws). To prove ownership, the claimant must do more than demonstrate that it is the record owner of the property; it must provide some evidence of control. *See United States v. One 1982 Porsche 928,* 732 F.Supp. 447, 451 (S.D.N.Y.1990) ("While ownership may be proven by actual possession, dominion, control, title and financial stake, '[t]he possession of bare legal title to the res may be insufficient,' absent other evidence of control or dominion over the property."); *see also United States v. One 1945 Douglas C-54 (DC-4) Aircraft,* (Appeal 2), 647 F.2d 864, 866 (8th Cir. 1981); *United States v. One 1945 Douglas C-54 (DC-4) Aircraft,* (Appeal 1), 604 F.2d 27, 28–29 (8th Cir.1979); *United States v. One 1977 36 Foot Cigarette Ocean Racer,* 624 F.Supp. 290, 294–95 (S.D.Fla.1985); *United States v. One 1981 Datsun 280ZX,* 563 F.Supp. 470, 474 (E.D.Pa.1983). Ultimately, the claimant must prove that its alleged title to the property is superior to the judgment creditor's right to execute judgment on the property. *See, e.g., Baars v. Creary,* 23 Fla. 311, 314, 2 So. 662, 663 (stating that "[t]he purpose of the [Florida] claim statute is to provide a summary remedy for a stranger to an execution, who claims title to the property levied on, to have the question of the superiority of his alleged title, over the right to the plaintiff in execution to subject it to the satisfaction of his execution and judgment, settled.").

 The Court finds that Witwater has failed to satisfy its burden of proof. Witwater presented sufficient evidence at the April 19, 1999 hearing for the Court to conclude that Witwater holds legal title to the Wittug. *See* Exs. B–1 (certified copy of the Wittug's certificate of ownership), B–2 (certified translation of the ownership certificate), and B–3 (copy of the Wittug's registry). Witwater, however, failed to present any evidence indicating that the Wittug is under its control. At the hearing, the United States called as an expert witness John O'Connor ("O'Connor"), who, in October of 1995, authored a report for Price Waterhouse LLP that was used in Oelsner's sentencing. *See* April 19, 1999 Hr'g Tr. at 117. O'Connor testified that, as of October 31, 1995, Oelsner was the equitable owner of the Wittug. *See id.* at 129, 133 (Witwater is "one of several corporations that . . . held vessels that rolled up to Challenger, which ultimately rolled up to Oceanic and Finance, which was directed by Mr. Oelsner."). This testimony is consistent with the Price Waterhouse Report ("Report"), which the Court admitted into evidence.[6]

---

**6.** Witwater objected to the admission of the Report, arguing that the proper foundation had not been laid and that the document contained inadmissible hearsay. *See* April 19, 1999 Hr'g Tr. at 119, 149. The Court admitted the document over Witwater's objections. *See id.* at 149.

The Court finds that Witwater's hearsay objections are unfounded. O'Connor testified as to the information contained in the Report, and Witwater cross-examined O'Connor regarding his testimony. Witwater's foundation objections are equally without merit. An expert's testimony is admissible even where the facts or data on which he relies are not admitted into evidence. *See* Fed.R.Evid. 703.

Where testimony or a piece of evidence may assist the trier of fact, the rules of evidence favor the admission of that testimony or evidence. *See Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997). This preference holds true for expert testimony and reports, the admissibility of which is governed by Fed.R.Evid. 702. *See id.* Expert testimony and reports are admissible if they are both reliable and relevant. *See id.* O'Connor's explanation of the sources he consulted in order to prepare the Report are indicative of its reliability. *See* April 19, 1999 Hr'g Tr. at 121 (O'Connor reviewed "thousands of documents including banking documents, legal documents, appraisal documents, accounting documents, as well as, . . . inter-

At the hearing, Witwater challenged O'Connor's conclusion that Oelsner is the equitable owner of the Wittug on two grounds. First, Witwater asked whether O'Connor knew "whether or not Mr. Oelsner presently controls any of the assets [O'Connor] found that [Oelsner] controlled in October of '95." *Id.* at 137–38. Where a judgment lien has attached to property equitably owned by the judgment debtor, a third party deriving its interest from the equitable owner takes subject to the lien. *See* 46 Am.Jur.2d Judgments § 401 (1994). Therefore, Witwater's inquiry into the present equitable owner of the Wittug is irrelevant. Second, Witwater asked whether O'Connor was familiar with time charters, bare boat charters, and maritime agency arrangements,[7] implying that Oelsner's interest in the Wittug was not an ownership interest but was the product of one of the foregoing. *See* April 19, 1999 Hr'g Tr. at 142–44. Despite the fact that the Court gave the parties leave to file post-hearing briefs, *see* April 19, 1999 Hr'g Tr. at 148, Witwater presented *no evidence* to the Court indicating that Oelsner and Witwater had entered into a time charter or a bare boat charter agreement with regard to the Wittug. The only evidence that supports Witwater's claim that Oelsner served as its agent is O'Connor's statement—confirmed by the Report—that Oelsner frequently signed as agent for Challenger Limited, the corporation that is the legal owner of Witwater Corporation. *See id.* at 145. The Court therefore concludes that Oelsner is the equitable owner of the Wittug and that this interest in the vessel is superior to the interest claimed by Witwater Corporation as the vessel's record owner.

The Court will order that judgment be executed on the Wittug.[8] Where a statute describes in broad terms the property which is subject to levy, the statute is interpreted to include property in which the defendant's ownership interest is equitable in nature.[9] *See* 30 Am.Jur.2d

---

viewing Mr. Oelsner."); Ex. G–5 at 8–9 ("To complete the work requested, I reviewed a significant number of documents related to business transactions, corporate structuring, corporate officers and statements made by W. James Oelsner under oath and during my interview with him .... The investigation/analysis conducted was clearly dominated by review of corporate records. These records have been received from Mr. Oelsner and third parties such as banks, accountants, corporate officers, and others familiar with Oelsner or his related companies. These corporate documents were reviewed for signs of ownership, control, interrelationships, and other attributes which may be meaningful in determining the ownership of certain assets and the validity of statements made by Mr. Oelsner with respect to his ownership of properties and vessels.").

7. The difference between a time charter and a bare boat charter has been described as follows:

A demise [or bare boat] charterer is "one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof for a specified period," *Stephenson v. Star–Kist Caribe, Inc.*, 598 F.2d 676, 679 (1st Cir.1979), in contrast to a time or voyage charterer who "contracts not for the vessel itself but for a specific service of the vessel, such as car-

riage of goods, which is rendered by the owner's master and crew," id.

*McAleer v. Smith*, 57 F.3d 109, 112–13 (1st Cir.1995). An agency relationship exists among individuals or entities where there "is a mutual interdependence of the financial credit and stability of each of the parties, agent and owner." *Compagnia Maritima La Empresa, S.A. v. Pickard*, 320 F.2d 829, 832 (5th Cir.1963).

8. The Court is aware that judgment cannot be executed on property that exceeds the amount of the judgment. *See* 28 U.S.C. § 3203(c)(3)(B) (West 1994). In its December 16, 1998 opinion and order, the Court instructed the parties that the April 19, 1999 hearing would be held for the purpose, among other things, of determining the Wittug's value. *See United States v. West Indies Transport Co., Inc.*, 35 F.Supp.2d 450, 454, 458 (D.V.I.1998). Despite this instruction, none of the parties has presented the Court with any evidence regarding the Wittug's value. Therefore, the Court will assume that the value of the Wittug does not exceed the amount of the judgment.

9. Equitable ownership has been described as follows:

An equitable estate, in its very conception, and as a fact, requires the simultaneous

Executions and Enforcement of Judgments § 176 (1994). The FDCPA is broadly drawn to subject to levy "[a]ll property in which the judgment debtor has a substantial nonexempt interest." 28 U.S.C. § 3203(a) (West 1994). The Court interprets this language to include that property in which the judgment debtor's interest is equitable.

## C. PETITION FOR ORDER OF MANDAMUS

 Witwater seeks an order of mandamus instructing Michael E. Murphy ("Murphy"), in his capacity as Area Port Director for the United States Customs Service, to grant clearance to the Wittug to depart St. Thomas. *See* Pet. for Order of Mandamus at 4. 28 U.S.C. § 1361 (West 1993) states that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The Third Circuit has determined that this provision "provide[s] relief only where a clear duty is owed the plaintiff or there is an abuse of discretion." *Grant v. Hogan*, 505 F.2d 1220, 1225 (3d Cir.1974).

Murphy is under no obligation to release the Wittug to Witwater. In fact, Murphy is prohibited from doing so. A vessel that is subject to a lien in favor of the United States may not be granted clearance to depart its port. *See* 34 O. Att'y Gen. 244 (1923). Having found that the United States' lien against the Wittug is valid and enforceable by way of levy, the Court must deny Witwater's petition for order of mandamus.

existence of two estates or ownerships in the same subject-matter, whether that be real or personal,—the one legal, vested in one person, and recognized only by courts of law; the second equitable, vested in another person, and recognized by courts of equity. These two interests must be separate, and as a rule, must be held by different persons; for if the legal estate and the equitable estate both become vested in the

## III. CONCLUSION

For the foregoing reasons, the Court will deny Oelsner's request to reduce restitution, deny both Oelsner's and Witwater's motions to quash the writ of execution, and deny Witwater's petition for order of mandamus. The United States may proceed to execute judgment by levying on the Wittug.

same person by the same right, then, as a general rule, a merger takes place, and the legal estate alone remains .... [T]he ownership of the equitable estate is regarded by equity as the real ownership, and the legal estate is ... no more than the shadow always following the equitable estate.
1 Pomeroy's Equity Jurisprudence § 147 (5th ed. 1941).