Edward J. McALEER, Administrator of the Estate of James F. McAleer, and Hardy Lebel and Joan Lebel, Administrators of the Estate of Thomas A. Lebel, Plaintiffs, Appellants,

v.

Traver C. SMITH, Administrator of the Estate of Stuart A. Finlay, Defendant, Appellee.

No. 94–2198.

United States Court of Appeals, First Circuit.

Heard May 5, 1995.

Decided June 19, 1995.

STAHL, Circuit Judge.

Plaintiffs-appellants appeal from the district court's grant of summary judgment to defendant-appellee in this admiralty case. We affirm.

## I.

### BACKGROUND

On June 3, 1984, the Tall Ship S/V MARQUES, a participant in the Cutty Sark International Tall Ships Race between Bermuda and Nova Scotia, encountered a violent squall about eighty miles northeast of Bermuda. Almost without warning, and within seconds of starting to take on water, the vessel sank with the loss of nineteen of the twenty-eight persons on board, including the plaintiffs' decedents and the defendant's decedent, the vessel's master or captain, Stuart A. Finlay. Plaintiffs' decedents, James F. McAleer and Thomas A. Lebel, were on board under the auspices of a sailing program run by the American Sail Training Association ("ASTA"), which had arranged for six sail trainees to crew for the MARQUES during the race.

Plaintiffs brought claims against defendant for unseaworthiness under the general maritime law; for negligence under the Jones Act, 46 U.S.C.App. § 688; for negligence under the general maritime law; and for wrongful death under the Death on the High Seas Act, 46 U.S.C.App. §§ 761–768 ("DOHSA"). The district court granted summary judgment to defendant, holding that defendant could not be liable for unseaworthiness because Finlay was not an owner of the MARQUES, *McAleer v. Smith*, 818 F.Supp. 486, 494 (D.R.I.1993); for negligence under the Jones Act, because Finlay did not employ plaintiffs' decedents, *id.* at 493–94; for negligence under the general maritime law, because such claims cannot be brought by seamen against masters, *id.* at 496; or under DOHSA, because DOHSA is a derivative cause of action requiring the existence of another claim not existent here, *id.* at 496–97. From that judgment this appeal followed.[1]

Edward M. Pitts with whom Pitts & Pitts was on brief for plaintiffs, appellants.

Holly S. Harvey with whom Thornton, Davis & Murray, P.A., was on brief for defendant, appellee.

Before CYR, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

---

1. The district court granted defendant's motion for summary judgment on April 8, 1993. The

## II.

## DISCUSSION

### A. Standard of Review

█ As always, we review a district court's grant of summary judgment *de novo* and, like the district court, review the facts in the light most favorable to the nonmoving party. *See, e.g., Lareau v. Page,* 39 F.3d 384, 387 (1st Cir.1994). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B. Unseaworthiness

█ Shipowners are liable to indemnify seamen[2] for injuries "caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment." *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 90, 66 S.Ct. 872, 875, 90 L.Ed. 1099 (1946) (citing *The Osceola,* 189 U.S. 158 (1903)). Unseaworthiness "is essentially a species of liability without fault.... It is a form of absolute duty." *Id.* at 94–95, 66 S.Ct. at 877; *see also* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 6–41, at 393 (2d ed. 1975). Shipowners may not delegate their duty to provide a seaworthy ship. *Sieracki,* 328 U.S. at 94 n. 11, 66 S.Ct. at 877 n. 11.

Plaintiffs concede that Finlay did not own the MARQUES, which was co-owned by Mark Shirley Portal Litchfield and Robin Patrick Cecil–Wright, the sole principals in the China Clipper Company, an unincorporated holding company that held title to the MARQUES. Plaintiffs argue, however, that Finlay is nonetheless liable for unseaworthiness because he was an owner *pro hac vice.*

█ An "owner *pro hac vice*" of a vessel is "one who 'stands in the place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel.'" *Matute v. Lloyd Berm. Lines, Ltd.,* 931 F.2d 231, 235 n. 2 (3d Cir.) (quoting *Aird v. Weyerhaeuser S.S. Co.,* 169 F.2d 606, 610 (3d Cir.1948), *cert. denied,* 337 U.S. 959, 69 S.Ct. 1521, 93 L.Ed. 1758 (1949)), *cert. denied,* 502 U.S. 919, 112 S.Ct. 329, 116 L.Ed.2d 270 (1991). In effect, for liability purposes, an owner *pro hac vice* is treated as a shipowner. *See Reed v. The Yaka,* 373 U.S. 410, 412–13, 83 S.Ct. 1349, 1351–52, 10 L.Ed.2d 448 (1963); *see generally* Gilmore & Black, *The Law of Admiralty* § 4–23, at 242. Thus, an owner *pro hac vice* may be liable for the unseaworthiness of a vessel. *See Reed,* 373 U.S. at 412–13, 83 S.Ct. at 1351–52. In general, if there is an owner *pro hac vice,* the title owner will be absolved of personal liability (except for defective conditions that existed before the owner *pro hac vice* took control of the vessel). *See Ramos v. Beauregard, Inc.,* 423 F.2d 916, 917–18 (1st Cir.), *cert. denied,* 400 U.S. 865, 91 S.Ct. 101, 27 L.Ed.2d 104 (1970); *see generally* Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5–3, at 168 (1987).

█ Admiralty cases have recognized only two types of owners *pro hac vice:* demise, or bareboat, charterers and captains of fishing vessels operated under agreements, called "lays." A demise charterer is "one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof for a specified period," *Stephenson v. Star–Kist Caribe, Inc.,* 598 F.2d 676, 679 (1st Cir.1979), in contrast to a time or voyage charterer who "contracts not for the vessel itself but for a specific service of the vessel, such as carriage

---

district court nonetheless held a trial to determine damages because it had entered default judgments against the co-owners of the MARQUES, *see McAleer v. Smith,* 860 F.Supp. 924, 930 n. 10 (D.R.I.1994). On October 18, 1994, the district court entered judgments of $403,-246.57 for Lebel and $322,597.25 for McAleer against the co-owners, and entered final judgments in favor of defendant in the instant appeal and other defendants.

**2.** For the purposes of this summary judgment motion, we assume *arguendo,* as Judge Selya did for other MARQUES sail trainees in *Heath v. American Sail Training Ass'n,* 644 F.Supp. 1459, 1468 (D.R.I.1986) (Selya, J.), that plaintiffs' decedents were seamen despite the fact that they were unpaid (indeed, themselves paying for the privilege of being on board as trainees).

of goods, which is rendered by the owner's master and crew," *id.* Demise charters are created when "the owner of the vessel ... completely and exclusively relinquish[es] possession, command, and navigation thereof to the demisee. [They are] therefore tantamount to, though just short of, an outright transfer of ownership. However, anything short of such a complete transfer is a time or voyage charter party or not a charter party at all." *Guzman v. Pichirilo*, 369 U.S. 698, 699–700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962) (internal quotation and citations omitted); *see generally* Gilmore & Black, *The Law of Admiralty* § 4–21, at 240. While demise charterers may be liable for unseaworthiness as owners *pro hac vice, see Reed,* 373 U.S. at 412–13, 83 S.Ct. at 1351–52, time or voyage charterers may not be, *see Stephenson,* 598 F.2d at 679; *see also Rodriguez v. McAllister Bros., Inc.,* 736 F.2d 813, 815 (1st Cir.1984). The mere fact that a time or voyage charterer " 'has some control over the master ... [or] selects the routes to be taken or the cargo to be carried does not make him the owner *pro hac vice.' " Stephenson,* 598 F.2d at 681 (quoting *Fitzgerald v. A.L. Burbank & Co.,* 451 F.2d 670, 676 (2d Cir.1971)) (alterations in *Stephenson* ).

■ Captains of vessels operated under fishing lays, which are agreements under which the participating fishermen share the catch, may also be liable as owners *pro hac vice. See Cromwell v. Slaney,* 65 F.2d 940, 941 (1st Cir.1933). Such situations are similar to demise charters, for a fishing-lay captain will only be found to be an owner *pro hac vice* if "the captain employs the members of the crew and controls all the operations of the vessel, both in purchasing supplies for the voyage, in determining where he will fish, how long, and in disposing of the catch and settling all the bills." *Id.*

■ Plaintiffs cite no case, and we have found none, outside the context of a fishing lay that accords a master status as an owner *pro hac vice.* In fact, many of our cases find an owner liable precisely *because* the owner (rather than, say, the time charterer) provid-

ed the master and crew. *See Stephenson,* 598 F.2d at 680. As a general rule, we think that masters are not owners *pro hac vice* because a master, despite having control over the vessel, exercises that control on behalf of the owner. *Cf.* 46 U.S.C. § 10101(1) (defining "master" as "the individual having command of a vessel"); 46 U.S.C. § 10101(2) (defining "owner" as "the person to whom the vessel belongs").

■ Plaintiffs argue, however, that even if masters are not generally considered to be owners *pro hac vice,* Captain Finlay had responsibilities for and interests in the MARQUES beyond those of an ordinary master that render him liable as an owner *pro hac vice.* In particular, plaintiffs point out that Finlay had full operational control of the MARQUES, except that he had to report itinerary changes to the owners; that Finlay drew the ship's regulations for both mates and crew members, and that everyone on board was required to "read" his orders; that Finlay's contract with the MARQUES's owners designated him as "self-employed"; that Finlay was engaged in promoting the business of the MARQUES, such as charters and cruises, for which he was paid a commission in addition to his monthly base pay;[3] that Finlay was required to solicit contributions towards expenses and was obligated whenever possible to negotiate directly with suppliers to obtain free or discounted supplies in exchange for publicity or other recompense arrangements; that Finlay was a founding member and chief instructor of the Antiguan Maritime School and expected to use the MARQUES as a training ship to train young Antiguans in seamanship; and that the "Ship's Regulations" provided that one person, the captain, was solely responsible for the safety of the ship and those on board. Plaintiffs also point out that their decedents had no contact with the MARQUES's actual owners, but only with ASTA and Finlay, and make much of the fact that Finlay had the right to direct and control plaintiffs' decedents in the performance of

---

**3.** Although he received 1000 British pounds sterling per month while the MARQUES was at sea and 500 pounds per month while ashore, plain-

tiffs also argue that Finlay was not a salaried employee.

their duties as sail trainees and the right to fire and/or remove them from the ship.

We fail to see how these facts convert Finlay into an owner *pro hac vice.* In determining that Finlay was not an owner *pro hac vice,* we are mindful not only of the law of agency, but also of the fact that time charterers, who may exercise large amounts of control over the vessels they charter, are not subject to liability for unseaworthiness, *see Stephenson,* 598 F.2d at 679. While we take plaintiffs' arguments in turn, even considered cumulatively we do not think they support Finlay being considered an owner *pro hac vice.*

While Finlay did exercise operational control over the MARQUES, that control is inherent in being a master; it does not convert Finlay into an owner *pro hac vice.* Similarly, drawing up the ship's regulations and giving orders are part and parcel of a master's duties; such activities do not accord Finlay status as an owner *pro hac vice.* That Finlay was designated as "self-employed" also does not make him an owner *pro hac vice.* Despite being "self-employed," Finlay still functioned as an agent of the owners; he did not assume control of the MARQUES in his own right and, accordingly, cannot be said to have stood in the place of the owner.

We also do not think that the fact that Finlay was to receive a commission for business he brought to the MARQUES makes him an owner *pro hac vice,* any more than a salesman paid a commission for his sales or a businessman paid a bonus for business brought in or money saved would become an owner of the business. Similarly, that Finlay was required to negotiate with suppliers does not make him an owner *pro hac vice;* rather, it was just one of the duties imposed on him by the MARQUES's actual owners. There is no evidence that Finlay was to share in any savings generated by these negotiations. Indeed, the owners were responsible for all expenses associated with the MARQUES, including those incurred by captains for generating business or negotiating for supplies.

Nor do we think that Finlay's role in the Antiguan Maritime School converts him into an owner *pro hac vice.* While at some point in the future this may have brought some business to the MARQUES, thus being mutually beneficial for both Finlay and the owners of the MARQUES, there is no evidence that Finlay had actually brought such business to the MARQUES or that arrangements for such a venture had actually been made. Nor is there any evidence to suggest that Finlay had entered into any sort of partnership with the owners of the MARQUES regarding the school; the implication, therefore, is that Finlay would have received his standard commission for bringing business to the MARQUES if in fact he ever brought such business from the school.

█ The fact that the Ship's Regulations provided that the captain was solely responsible for the safety of the ship and those on board does not make Finlay liable for the ship's unseaworthiness, because a shipowner's duty to provide a seaworthy ship is nondelegable. *See Sieracki,* 328 U.S. at 94 n. 11, 66 S.Ct. at 877 n. 11. Holding Finlay to be an owner *pro hac vice* because the Ship's Regulations made him solely responsible for the safety of the ship would defeat the rule of nondelegability, for it would absolve the owners of liability for unseaworthiness. *See Ramos,* 423 F.2d at 917–18 (holding that owner could not be "liable for unseaworthy conditions arising after he has parted with control over his vessel under a demise charter" and that "a shipowner cannot escape liability by delegating partial control of his vessel to an independent contractor").

That plaintiffs' decedents had no contact with the MARQUES's owners, but only with ASTA and Finlay, does not convert Finlay into an owner *pro hac vice.* Finlay played no part in hiring plaintiffs' decedents or in arranging with ASTA to have paying sail trainees on board. Finlay was not to share in the profits from the owners' arrangement with ASTA, nor in any profits from the vessel's participation in the tall ships race. That Finlay had authority over plaintiffs' decedents is not indicative of status as an owner *pro hac vice,* for any master would necessarily have such authority over his crew.

█ To the extent that plaintiffs argue that Finlay was a partner or co-venturer with

the MARQUES's owners, the undisputed facts make clear, as the district court noted, that Finlay had no ownership interest in the vessel, did not share in the profits from the vessel's operations, and had no control over the vessel's itinerary beyond the operational control necessarily assumed by a captain. The marketing and commission arrangement raises no inference of a partnership.

Because plaintiffs have not produced facts that give rise to an inference that Finlay was either an owner *pro hac vice* or a partner in the MARQUES, summary judgment was properly granted to defendant on plaintiffs' unseaworthiness claims.

### C. The Jones Act

Congress passed the Jones Act in 1920 to abrogate the Supreme Court's holding in *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903), that seamen could not recover under the general maritime law for the negligence of the master or crew. *See generally* Gilmore & Black, *The Law of Admiralty* § 6–20, at 325–28. The Jones Act[4] provides a remedy to a "seaman" injured (or killed) "in the course of his employment." 46 U.S.C.App. § 688. The Jones Act remedy is available only against the seaman's employer. *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 787 n. 6, 69 S.Ct. 1317, 1320 n. 6, 93 L.Ed. 1692 (1949). Accordingly, plaintiffs can recover against defendant under the Jones Act only if Finlay was plaintiffs' decedents' employer.

Plaintiffs contend that if their decedents "were employees of anyone," they were employees of Captain Finlay. We do not agree. Although Finlay exercised authority over plaintiffs' decedents, he did so only as an agent of the owners, and not on his own behalf. *Cf. Matute*, 931 F.2d at 236 (Holding

that a time charterer was not a seaman's employer when "[t]he owner ..., *through the ship's captain*, hired Matute [the seaman] and eventually terminated him. It set the amount of Matute's wages and was responsible for paying him. The captain supervised Matute in his position as oiler.") (emphasis added). Finlay had nothing to do with arranging with ASTA for the sail trainees to be on board the MARQUES; accordingly, he cannot be said to have "hired" them in any sense. Nor was Finlay to receive any benefit from having the sail trainees on board; rather, monies paid by the sail trainees went to the owners of the MARQUES, with a small amount reserved by ASTA to cover its expenses.

In arguing that Finlay should be held to be plaintiffs' decedents' employer, plaintiffs rely on many of the same reasons they relied on in arguing that Finlay was an owner *pro hac vice*. We need not re-analyze those reasons here because they do not indicate that Finlay was an employer any more than they indicate that he was an owner *pro hac vice*. Accordingly, the district court properly granted summary judgment to defendant on plaintiffs' Jones Act claims.

### D. Negligence Under General Maritime Law

Plaintiffs argue that they are entitled to recover from defendant for negligence under the general maritime law on two separate theories. First, plaintiffs argue that they have such a cause of action if their decedents, as sail trainees who each paid $750 to crew on the MARQUES, are found to be passengers rather than seamen. Second, plaintiffs argue that if their decedents were seamen, they nevertheless may maintain a cause of action for negligence against the master un-

---

**4.** The Jones Act provides:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such sea-

man may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

46 U.S.C.App. § 688.

der the general maritime law. We consider these arguments in turn.

### 1. Recovery as Passengers

 Plaintiffs now urge that because their decedents paid to crew on the MARQUES, they may be considered passengers rather than seamen and so have a cause of action against the master for negligence under the general maritime law. Defendant argues, however, that plaintiffs never made this argument to the district court, and that in fact plaintiffs fought hard to establish that their decedents were seamen, as recovery for unseaworthiness and under the Jones Act is limited to seamen.

When asked at oral argument whether plaintiffs had raised this argument in the district court, plaintiffs' counsel referred the court to a portion of plaintiffs' memorandum of law opposing defendant's motion for summary judgment. In turning to plaintiffs' memorandum, the most applicable statement we could find reads, "A general maritime claim for negligence exists no matter what the status of Finlay was, even if he were found not to be an owner *pro hac vice.*" We do not view this statement as preserving a claim stemming from plaintiffs' decedents' possible status as passengers. In fact, in another portion of their memorandum, plaintiffs cited Judge Selya's opinion in *Heath v. American Sail Training Ass'n,* 644 F.Supp. 1459, 1463 (D.R.I.1986) (Selya, J.) (dealing with claims by other sail trainees killed in same accident), for the proposition: "It is established that the ASTA trainees were considered to be part of the permanent crew and divided into duty watches." Because plaintiffs did not raise any claims stemming from the possible passenger status of their decedents in the district court, we will not consider them on appeal. *See, e.g., Focus Investment Assocs., Inc. v. American Title Ins. Co.,* 992 F.2d 1231, 1240 n. 12 (1st Cir.1993).

### 2. Recovery as Seamen

 Plaintiffs argue that, even if their decedents are considered to have been sea-

men,[5] they nonetheless may maintain a cause of action against the master for negligence under the general maritime law. Deciding whether they are right requires us to examine the history of negligence under the general maritime law.

 As a general matter, anyone who is the victim of a maritime tort is entitled to bring an action in admiralty. *See, e.g., Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 413–14, 74 S.Ct. 202, 207–08, 98 L.Ed. 143 (1953) (business invitees may bring a cause of action for negligence); *cf. United NY & NJ Sandy Hook Pilots Ass'n v. Halecki,* 358 U.S. 613, 617–18, 79 S.Ct. 517, 519–20, 3 L.Ed.2d 541 (1959) ("the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care"). Seamen, however, were traditionally barred from exercising this remedy with respect to injuries caused by "the negligence of the master, or any member of the crew." *The Osceola,* 189 U.S. at 175, 23 S.Ct. at 487; *see also* Gilmore & Black, *The Law of Admiralty* § 6–21, at 328. Congress, in response to the rule of *The Osceola,* passed the Jones Act in order to give seamen "the same rights to recover for negligence as other tort victims. It follows, therefore, that, if plaintiff is a seaman, he can recover under the Jones Act; if he is not a seaman, he can recover under the general maritime law." Gilmore & Black, *The Law of Admiralty* § 6–21, at 328–29. Thus, it appears that the general maritime law affords seamen no right to recover for injuries caused by a negligent master or crew member, but that they may recover for such injuries from their employer under the Jones Act.

Plaintiffs make several arguments in an attempt to get around the rule that seamen have no general maritime cause of action for injuries caused by the negligence of the master or crew. First, plaintiffs cite *Cerqueira v. Cerqueira,* 828 F.2d 863 (1st Cir.1987); *Stoot v. D & D Catering Serv., Inc.,* 807 F.2d 1197 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 82, 98 L.Ed.2d 44 (1987); *Mahramas v.*

---

**5.** Defendant does not contest the seaman status of plaintiffs' decedents for purposes of the sum-

mary judgment motion.

*American Export Isbrandtsen Lines, Inc.,* 475 F.2d 165 (2d Cir.1973); and *Favaloro v. S/S Golden Gate,* 687 F.Supp. 475 (N.D.Cal. 1987), which they construe to grant seamen a cause of action for negligence under the general maritime law. Upon examining each of these cases, however, we find them distinguishable.

In *Cerqueira,* we allowed the equitable owner of a boat to sue his brother, the legal title owner of the boat, for simple negligence, positing that jurisdiction seemed proper on the basis of the court's general maritime jurisdiction. *Cerqueira,* 828 F.2d at 866. We did not, however, consider the plaintiff to be a "seaman," nor do we think a shipowner would generally be accorded seaman status. Thus, while *Cerqueira* may be read to provide a cause of action for negligence under the general maritime law, it does not support plaintiffs' argument that seamen are entitled to bring such an action for injuries arising from the negligence of the master or crew.

In *Stoot,* the Fifth Circuit considered the claim of a seaman injured during an altercation with the vessel's cook, who was employed by the defendant, an independent contractor providing catering services on board the vessel. The Fifth Circuit held that the catering company could not be held vicariously liable for the cook's intentional tort because it was committed outside the scope of her employment. *Stoot,* 807 F.2d at 1200. In so holding, however, the Fifth Circuit stated that the catering company could have been held vicariously liable to the seaman for its employee's wrongful acts if the employee had been acting in the course and scope of her employment. *Id.* at 1199. Based on this, plaintiffs argue that seamen may assert a cause of action for negligence under the general maritime law against independent contractors. Plaintiffs further argue that because Finlay's contract designated him as "self-employed," he should be treated as an independent contractor and his estate should be liable for his negligence under the general maritime law.

We need not decide whether we would follow the *Stoot* dictum granting seamen a cause of action against third parties for negligence under the general maritime law be-

cause we do not consider Finlay to have been a third party of the type envisioned by *Stoot.* Although his contract did designate him as "self-employed," Finlay did not function as an independent contractor, but rather as an employee and agent of the owners of the MARQUES. Even if Finlay was an independent contractor, however, we would hesitate to extend *Stoot* to negligence actions under the general maritime law by seamen against their independent-contractor masters, especially in light of the Supreme Court's holding that seamen cannot recover for the negligence of the master or crew under the general maritime law, *see The Osceola,* 189 U.S. at 175, 23 S.Ct. at 487.

*Mahramas* involved a hairdresser working aboard a cruise ship who was employed by the owner of the on-board beauty salon (not the shipowner) and who was injured when the ladder in her cabin allegedly gave way. *Mahramas,* 475 F.2d at 167. We fail to see how this case provides a claim under the general maritime law against the master for negligence. To the extent that plaintiff argues that *Mahramas* granted the plaintiff a general maritime cause of action for negligence against her independent-contractor employer (and therefore, by extension, that plaintiffs should have a general maritime cause of action for negligence against Finlay, since he was "self-employed"), we think that contention is belied by the case; the court did not consider the plaintiff's employer's liability for negligence under the general maritime law, but only under the Jones Act. *See id.* at 172, 23 S.Ct. at 485–86.

*Favaloro* involved claims brought by the estates of fishermen killed when the defendant tanker collided with and sank their fishing boat. To the extent that it recognizes a cause of action for negligence under the general maritime law, *Favaloro* does not support the inference that such claims may be brought by a seaman against the master of his own vessel, for it deals only with claims against a colliding vessel and the crew. *See Favaloro,* 687 F.Supp. at 477. Thus, all of the cases relied upon by plaintiffs are distinguishable from the instant case.

As a second basis for finding that seamen may maintain an action against their masters

for negligence under the general maritime law, plaintiffs rely on the "Seamen's Act of 1915," which provided: "In any suit to recover damages for any injury sustained on board vessel or in its service seamen having command shall not be held to be fellow-servants with those under their authority." *See* 46 U.S.C.App. § 688 (1975) historical note. Plaintiffs argue that this abolishes the fellow-servant rule, which the Supreme Court had referred to in *The Osceola,* 189 U.S. at 175, 23 S.Ct. at 487, by stating:

> we think the law may be considered as settled upon the following propositions:
>
> ....
>
> 3. That all the members of the crew, *except, perhaps, the master,* are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure.

(Emphasis added.) Plaintiffs conclude that because Congress abolished the fellow-servant rule, seamen may recover from their master for negligence under the general maritime law. We do not agree.

*The Osceola* barred seamen from suing their master or fellow crew members not because of the fellow-servant rule, but rather because the general maritime law did not provide seamen with a cause of action for such negligence:

> we think the law may be considered as settled upon the following propositions:
>
> ....
>
> 4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew.

*Id.; see Chelentis v. Luckenbach S.S. Co.,* 247 U.S. 372, 384, 38 S.Ct. 501, 503–04, 62 L.Ed. 1171 (1918) (characterizing the Seamen's Act of 1915 as "irrelevant" and holding that shipowners may not be held liable for the negligence of the crew); Gilmore & Black, *The Law of Admiralty* § 6–20, at 325–26 (describing Congress's abolition of the fellow-servant rule as an ill-fated attempt to abrogate *The Osceola* ). We do not think the Seamen's Act of 1915, now itself abrogated by the Jones Act, provided seamen with a

cause of action against a master for negligence under the general maritime law. We note that *Kennedy v. Gulf Crews, Inc.,* 750 F.Supp. 214, 215–16 (W.D.La.1990), the only other case that we know of to consider whether a master may be liable to a seaman for negligence under the general maritime law, rejected a similar argument by the plaintiff and held that a seaman does not have a cause of action against his master for negligence. *Cf. California Home Brands, Inc. v. Ferreira,* 871 F.2d 830, 834–35 (9th Cir.1989) (holding that the Jones Act did not operate to make negligent crew members liable to their employers for damages paid to other seamen under the Jones Act because crew members cannot sue each other for negligence).

We hold that the general maritime law does not afford seamen a cause of action for negligence against masters. Accordingly, summary judgment was properly granted to defendant on plaintiffs' counts for negligence under the general maritime law.

### E. DOHSA

■ Plaintiffs argue that they are entitled to recover against defendant under DOHSA, which provides:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas ... the personal representative of the decedent may maintain a suit for damages ... for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

46 U.S.C.App. § 761. The district court held that DOHSA does not create any substantive rights, but merely provides a cause of action against a party "which would have been liable if death had not ensued." *See McAleer,* 818 F.Supp. at 496. We agree. Plaintiffs assert no theory of recovery against defendant: they may not recover against defendant under the general maritime law for unseaworthiness, under the Jones Act for negligence, or under the general maritime law for negligence. Accordingly, there is no basis under which Finlay or his estate "would

have been liable" to plaintiffs' decedents if they were still living. Thus, summary judgment was properly granted to defendant for plaintiffs' claims under DOHSA.

### III.

### CONCLUSION

In conclusion, summary judgment was properly granted to defendant because (1) Finlay was not an owner *pro hac vice* of the MARQUES and so was not liable for unseaworthiness; (2) Finlay was not the employer of plaintiffs' decedents and so was not liable under the Jones Act; (3) plaintiffs did not argue below that they were not seamen and therefore were entitled to sue a master for negligence under the general maritime law; (4) seamen may not bring a cause of action against a master for negligence under the general maritime law; and (5) plaintiffs may not recover under DOHSA because they assert no theory of recovery under which Finlay or his estate would have been liable to plaintiffs' decedents if they were still living. In light of our holding, we need not consider plaintiffs' request for us to transfer the case to the District of Massachusetts.

*Affirmed.*