Stephen A. SMITH

v.

**UNITED STATES of America.**

**CA 93–0016ML.**

United States District Court,
D. Rhode Island.

May 13, 1996.

Kevin Donius, Michael B. Latti, Boston, MA, Robert T. Karns, Providence, RI, for Plaintiff.

Frank W. Hunger, Assistant Attorney General, Sheldon Whitehouse, United States Attorney, Providence, RI, R. Scott Blaze, Senior Admiralty Counsel, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant.

## DECISION AND ORDER

LISI, District Judge.

Plaintiff Stephen A. Smith commenced this action on January 12, 1993 pursuant to the Suits in Admiralty Act, 46 App. U.S.C. §§ 741–52, and the Public Vessels Act, 46 App.U.S.C. §§ 781–90, for compensatory damages and maintenance and cure for injuries alleged to have occurred as a result of negligence on the part of the defendant, the United States of America.[1] This matter was tried before the court without a jury on November 2, 3, and 6, 1995. For the reasons stated below, this court finds that plaintiff is entitled only to cure.

## I. FACTS

The incident that gave rise to this case occurred during the March 1991 voyage of

---

**1.** Plaintiff originally named both the United States and MAR, Inc. as defendants in this suit. By orders dated February 9, 1995 and August 10, 1995, this court granted summary judgment in favor of MAR, Inc. on all counts. *See Smith v. MAR, Inc.*, 896 F.Supp. 75 (D.R.I.1995); *Smith v. MAR, Inc.*, 877 F.Supp. 62 (D.R.I.1995).

the TWR–841 ("841"), an ocean-going vessel owned by the United States Navy and operated pursuant to contract by MAR, Inc.[2] At this time, plaintiff was employed as chief engineer on the 841. In this capacity, plaintiff essentially served as the 841's chief mechanic, and was responsible for maintaining the engines, pumps, and hydraulic and electrical systems on the vessel.

On March 14, 1991, the 841 departed Newport, Rhode Island for a rendezvous point in the Gulf of Maine, where it was to videotape the firing of a Tomahawk missile. The 841 traveled through Buzzard's Bay and into the Cape Cod Canal, entering Cape Cod Bay ("Bay") early that afternoon. The sea conditions in the Bay were a "little choppy"—that is, the seas were running between ten and twelve feet—although they lessened as the 841 moved away from the mouth of the Canal. Trial Transcript, II–252.

The weather outside of the Bay was more severe, however, and would have made the filming of the missile launch problematic at that time. As a result, the captain of the 841, Marcus Agrizones, ordered the 841 to station-steam in the lea of Cape Cod, off Provincetown Harbor, where the seas were minimal, until the weather conditions outside the Bay improved.[3] The 841 continued in this pattern into the evening of March 15. During this time, the crew monitored various weather forecasts, all of which predicted that the weather would improve to conditions that would be suitable for filming the missile launch by the morning of March 16. Based on these reports, Agrizones decided that the 841 should attempt to reach the rendezvous point in the Gulf of Maine.

At approximately 11:30 p.m. on March 15, Agrizones ordered the helmsman to change course and to begin to proceed out of the Bay. Upon being relieved of his watch by Second Mate David Sousa at 11:45 p.m. that evening, Agrizones instructed Sousa to maintain that course until the 841 reached the "Morse A" buoy, which would occur around midnight, at which time he was to change course to one that would take the 841 to the "number two" buoy. Upon reaching the "number two," Sousa was to telephone Agrizones to inquire as to whether or not to proceed on to the rendezvous point.

Sousa did as instructed. He testified that things were "smooth going" after making the turn at the Morse A, although the seas gradually increased to 15 to 20 feet within one hour. When the 841 reached the "number two" some time after 1:00 a.m., Sousa telephoned Agrizones, and the decision was made, based on the sea conditions, to return to the Bay.[4]

Shortly before midnight, plaintiff had been conversing with John Lee Phillips on the Mess Deck, located one deck below the bridge and one deck above the engine and pump rooms. Phillips, the First Engineer/Electrician on the 841, was proceeding from the sleeping compartment to the Engine Room, where he was to relieve plaintiff of his watch at midnight. Plaintiff advised Phillips to be careful using the ladders on the ship because the weather conditions had been rough. Plaintiff then began to step through a bulkhead doorway to proceed down a ladder to the pump room, which adjoined the Engine Room, to make the final rounds of his watch.

What happened next forms the center of the controversy at hand. Plaintiff contends that the ship experienced a violent roll—that is, a side to side movement—when the 841 changed course and turned broadside to the

2. This vessel is a torpedo and weapons retriever, approximately 120 feet long, designed to carry a crew of seven or eight. The vessel was constructed in accordance with plans approved by the Navy, and was acquired to serve as a support vessel for underseas warfare missions.

3. Station-steaming involves operating a vessel on a repetitive course within a confined area. This is generally performed in an area in which the weather is calm, and performed in an effort to delay departing on a course that would take the vessel into rougher weather until those weather conditions have tempered.

4. The next morning, the 841 was ordered to proceed to the rendezvous point by aircraft assigned to the mission. The 841 once again departed the Bay for the rendezvous point. Despite the fact that the seas had calmed, the Tomahawk Missiles were fired before the 841 could reach its filming position. As such, the 841 was ordered to return to port without ever having reached the rendezvous point.

seas. The majority of the other crew members on the 841 do not recall such a roll, but rather only the normal pitches and yaws that a boat would experience in heavy seas.[5] Notwithstanding this discrepancy, this court finds that what happened to plaintiff at this time is beyond dispute: as plaintiff stepped through the doorway of the bulkhead to proceed to the engine room, he fell down the ladder to the pump room, striking it with his shoulder as he fell, and landed on the floor at the base of the ladder.

## II. DISCUSSION

Plaintiff advances three grounds on which he asserts he is entitled to recover damages for the shoulder and back injuries he alleges to have sustained as a result of his fall. First, plaintiff contends that he is entitled to damages under the Jones Act because his injuries were proximately caused by the defendant's negligence. Second, plaintiff contends that the defendant is strictly liable for his injuries because the 841 was unseaworthy. Finally, plaintiff contends that he is entitled to maintenance and cure benefits because he sustained his injuries while in the service of the 841. Each of these claims will be addressed *seriatim.*

### A. Negligence

■ Generally, anyone who is a victim of a maritime tort is entitled to bring an action in admiralty. *See McAleer v. Smith,* 57 F.3d 109, 116 (1st Cir.1995). Seamen, however, were once precluded from exercising this right "with respect to injuries caused by 'the negligence of the master, or any member of the crew.'" *Id.* (quoting *The Osceola,* 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903); *see also Chandris, Inc. v. Latsis,* —— U.S. ——, ——, 115 S.Ct. 2172, 2183, 132 L.Ed.2d 314 (1995). In 1920, Congress enacted the Jones Act in an effort to "give seamen 'the same rights to recover for negligence as other tort victims.'" *McAleer v. Smith,* 57 F.3d at 116 (quoting Gilmore & Black, THE LAW OF ADMIRALTY § 6–21, at 328–29). Indeed, "the Jones Act provides the exclusive recovery in negligence for claims by seamen against their employers," *Ellenwood v. Exxon Shipping Co.,* 984 F.2d 1270, 1283 (1st Cir.), *cert. denied,* 508 U.S. 981, 113 S.Ct. 2987, 125 L.Ed.2d 682 (1993), and provides a remedy to a "seaman" injured in the course of his or her employment, *McAleer v. Smith,* 57 F.3d at 115.

■ The Jones Act imposes upon the employer the duty of paying damages when injury to the worker is proximately caused, in whole or in part, by the employer's fault. *See Kernan v. American Dredging Co.,* 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958). "A plaintiff's burden of proving causation under the Jones Act is 'featherweight.' Liability exists if the employer's negligence contributed even in the slightest to the plaintiff's injury." *Toucet v. Maritime Overseas Corp.,* 991 F.2d 5, 10 (1st Cir.1993) (citations omitted).

■ "Negligence is ... a failure to observe for the protection of the rights of others that degree of care, precaution, and vigilance which the circumstances justly demand...." *1st Bank Southeast of Kenosha, Wis. v. M/V Kalidas,* 670 F.Supp. 1421, 1431 (E.D.Wis.1987) (quoting *Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 118 n. 6, 83 S.Ct. 659, 665 n. 6, 9 L.Ed.2d 618 (1963)). In other words, negligence is the failure to observe the degree of care which people of ordinary prudence and acumen use under the same or similar circumstances. *See id.*

■ The employer's fundamental duty under the Jones Act is to provide its seamen with a reasonably safe place to work—*i.e.,* a safe vessel. *See* THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6–21, at 313 (1994). In seeking damages based on the defendant's negligence, plaintiff cites to three instances in which he alleges that the captain and crew of the 841 breached this duty. With respect to each of these instances, however, plaintiff has failed to establish that the defendant breached its duty to provide plaintiff with a safe workplace.

---

**5.** Pitch refers to the alternate lift and fall of each end of a vessel in a head sea. *See* W.A. McEwen & A.H. Lewis, ENCYCLOPEDIA OF NAUTICAL KNOWLEDGE 399 (1992). Yaw refers to the temporary swing of a vessel from its course caused by the action of a following or quarterly sea. *See id.* at 614.

## 1. *Negligent Entrustment*

The first instance in which plaintiff alleges that the defendant was negligent occurred when Agrizones turned over control of the ship to Sousa at 11:45 p.m. on March 15. Plaintiff contends that Agrizones, an experienced seaman who had previously spent twenty-three years in the United States Navy, should not have turned command of the ship over to Sousa, or the helm to Sean Corr, at a time when the vessel was about to venture into severe weather conditions and heavy seas. Plaintiff argues that the reasonable course of action would have been for Agrizones to have remained in command of the vessel and to have assigned a more experienced individual to the helm.

In so asserting, plaintiff points to the lack of experience on the part of Sousa and Corr in piloting ships in heavy seas. Indeed, plaintiff points to the fact that Sousa obtained the majority of his prior experience commanding vessels as the captain of ferry and dinner boats that sailed in Narragansett Bay, Rhode Island, where he did not have the opportunity to navigate a vessel in heavy weather or on the open ocean. Moreover, plaintiff cites to the fact that the extent of

Corr's previous experience was gained in the two years he had been employed by MAR, Inc., during which time he had only made five or six voyages, and the fact that he had been prone to becoming seasick in the past.

Plaintiff's contention requires this court to address two issues: first, whether Agrizones was negligent in allowing himself to be relieved by anyone prior to departing from Cape Cod Bay; and, second, whether Agrizones was negligent in allowing himself to be relieved by Sousa and Corr in particular.

■ With respect to the former issue, plaintiff has failed to establish that the defendant's duty under the Jones Act was breached when Agrizones allowed himself to be relieved of command at that point in the trip. One of the defendant's expert witnesses, David C. DuBois,[6] testified that it is "the custom and practice on seagoing vessels ... for the captain to leave ... night orders to the deck watch officers. The night orders are guidelines provided to the deck watch officer in the event that certain things happen; what [the captain's] instructions are." Trial Transcript, III–47. Moreover, plaintiff's own expert witness, Captain Adrian Lonsdale,[7] testified only that *he* would not

6. David C. DuBois graduated from the United States Coast Guard Academy in 1969. Following graduation, DuBois served as a shipboard engineering officer and safety officer on various Coast Guard vessels until 1972. Thereafter, DuBois served in the Coast Guard Marine Inspection Offices in Norfolk, Virginia and Providence, Rhode Island, as well as senior engineer on the Coast Guard Cutter BIBB.

In 1980, DuBois retired from active duty and founded the Tidewater School of Navigation, a private trade school that provided education and training to merchant marine personnel in anticipation of their sitting for examinations given by the Coast Guard for various maritime licenses or professional documents. At the same time, DuBois founded Marine Safety Consultants, Inc., an independent private-sector marine surveying and casualty investigation company. While DuBois divested himself of his interest in the Tidewater School of Navigation in the mid-1980's, he continues to serve as president and principal surveyor of Marine Safety Consultants.

7. Captain Lonsdale graduated from the United States Coast Guard Academy in 1950, where he received a Bachelor of Science degree in marine engineering. Lonsdale served as an officer in the Coast Guard for a total of thirty-three years, from 1945 to 1978, and specialized in surface

operations. During this time, he served on a myriad of boats, ranging from small patrol boats to larger cutters, and received numerous medals and decorations, including the Legion of Merit with Combat V Medal, the Bronze Star, and the Vietnam Service Medal.

Following his retirement from the Coast Guard, Lonsdale continued to go to sea as a chief mate and captain of small tankers, as well as the relief captain of the Research Vessel ENDEAVOR, which is owned by the University of Rhode Island. From 1987 to July 1995, Lonsdale was president and co-owner of the Northeast Maritime Institute in New Bedford, Massachusetts, a trade school that prepares mariners for various examinations given by the Coast Guard for licenses necessary to work in the merchant marine industry. From July 1995 to present, Lonsdale has served as the Director of Education at that school.

Lonsdale has authored several articles regarding industrial safety aboard ships, and holds a Master Unlimited Oceans license from the Coast Guard. This license—subject to the successful completion of a drug test and physical examination—would allow him to serve as captain of any ship anywhere in the world. In addition, Lonsdale has five or six pilotage endorsements, in-

have turned over command of the vessel to a junior mate had *he* been the captain on that voyage. Lonsdale, however, offered no testimony that Agrizones's decision deviated from the prevailing practice in the maritime community.

■ The issue raised with respect to the latter claim presents a much closer question for this court. As plaintiff correctly notes, neither Sousa nor Corr were as experienced as Agrizones in operating vessels in heavy seas. Indeed, it is quite clear that neither had had any substantial experience in their respective positions in heavy seas. Notwithstanding this fact, however, there was absolutely no testimony to suggest that they lacked the experience required to perform their duties safely that night. Captain Lonsdale testified that there was nothing wrong with Agrizones's orders to Sousa and that there was nothing to suggest that Sousa was not a competent seaman. *See* Trial Transcript, II–157–59. DuBois's testimony supports this conclusion as well: he testified that Corr was "experienced enough for his job" and that Sousa's level of experience was sufficient for the conditions. Trial Transcript, III–77–79.

### 2. *Negligent Operation*

■ Plaintiff next asserts that the defendant is liable for damages as a result of the negligent operation of the 841 during this mission. Specifically, plaintiff contends that Sousa and Corr carelessly positioned the 841 broadside to heavy seas shortly after midnight on March 16. According to plaintiff, such positioning can cause a vessel to experience excessive rolls, which in turn can cause objects and crew members to be thrown about.

During trial, plaintiff offered the testimony of Captain Lonsdale in support of his contention that the ship was so positioned. Lonsdale concluded that the vessel took the seas on its beam based on his reconstruction of the events that occurred on March 15 and 16. He reconstructed the voyage using the courses the 841 traveled, as recorded in the

ship's log, as well as wind and sea conditions for that night, as recorded by a weather buoy operated by the National Oceanic and Atmospheric Administration ("NOAA").

Captain Lonsdale's testimony is unpersuasive, however. His conclusion as to how the 841 was positioned relative to the prevailing seas differed from the recollections of Corr and Sousa, both of whom testified that at no time prior to 1:00 a.m. on March 16 did the 841 take seas on its beam. This testimony is borne out by the wind and sea conditions recorded in the 841's log that evening. The discrepancy can be attributed to the fact that the wind and sea conditions Lonsdale factored into his calculations were obtained from the NOAA weather buoy, which was located approximately forty to forty-five miles away from the location at which the 841 made its turn. Indeed, Captain Lonsdale admitted during cross-examination that had he factored the wind and sea conditions recorded in the 841's log into his analysis, he would not have concluded that the 841 took the seas on its beam. *See* Trial Transcript, II–105.

Moreover, even if there were factual support for plaintiff's contention that Corr and Sousa positioned the 841 broadside to the seas, plaintiff has failed to establish that the operation of a vessel in this manner would have been negligent. The plaintiff offered no testimony that showed that the 841 could not have been safely operated when taking seas on its beam. Captain Lonsdale testified that Agrizones's decision to follow the course—which, according to Lonsdale, exposed the 841 to seas on the beam—was correct. Further, DuBois testified that sometimes "[i]f you're trying to get from point A to point B and you're beam to seas, then that's what you have to do. That happens all the time." Trial Transcript III–83.

### 3. *Failure to Warn*

■ Finally, plaintiff contends that the defendant acted negligently in failing to issue a warning that the 841 would be leaving the protective waters of Cape Cod Bay at the

cluding one for the Cape Cod Canal, which allow him to navigate vessels in areas restricted to others.

Morse A buoy and that it would be changing its course so that it would thereafter be exposed to heavy seas on its beam. Plaintiff contends that had he received such a warning, he could have braced himself to avoid being tossed about and injured. This argument can be dispensed with forthwith for two reasons.

First, plaintiff failed to establish that the 841 was subjected to seas on the beam. *See supra* part II.A.2. Second, plaintiff failed to establish that either Agrizones or Sousa was negligent in failing to issue a warning that the 841 would discontinue its station-steaming, thereby encountering more severe weather conditions. DuBois testified that he knew of no situation on Coast Guard or merchant vessels, other than in an emergency or general alarm situation, in which an announcement with respect to course changes would be made after dark and after the ship's work had stopped. This court finds DuBois credible and knowledgeable with respect to this issue given his years of experience at sea. Further, Captain Lonsdale's testimony is consistent with DuBois's. He stated that it was his experience that warnings were generally issued only before 10:00 p.m. so that the crew could take steps secure themselves and their equipment.

Based on the testimony of both experts, this court finds that the failure to issue a warning did not amount to a deviation from the usual and accepted practice on ships of this type. Thus, plaintiff's negligence claim is without merit, and this court turns to address his two remaining claims.

### B. Unseaworthiness

Plaintiff next asserts that the defendant is liable for damages incurred as a result of his injuries on the grounds that the 841 was unseaworthy. Specifically, plaintiff contends that there should have been a handhold located on the inside of the doorway at the top of the ladder down which he fell. Plaintiff's expert, Captain Lonsdale, testified that this handhold should have consisted of an elongated "U-bar" of one-half inch stock. Trial Transcript, II–99. Plaintiff contends that a handhold of this type was necessary to allow crew members to secure themselves as they stepped through the doorway leading to the ladder.

Before reaching the merits of plaintiff's unseaworthiness claim, it is incumbent upon this court to ascertain its jurisdiction over this subject matter. The defendant contends that any decision regarding the design of the vessel, including the existence and number of handholds, was within its discretion and grounded in policy. It contends that such decisions are beyond the scope of this court's jurisdiction.

 The Suits in Admiralty Act ("SAA") "effects a waiver of the sovereign immunity of the United States for certain maritime claims against the United States." *Gercey v. United States*, 540 F.2d 536, 539 (1st Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). Unlike the Federal Tort Claims Act ("FTCA"), however, the SAA does not contain an express exception to the immunity waiver "for harm caused by the exercise of 'discretionary functions....'" *Id.* Notwithstanding this fact, it is well-established that the FTCA's discretionary function exception is "implicit in private suits brought against the United States Government under the [SAA]." *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995), *cert. denied*, ── U.S. ──, 116 S.Ct. 1823, 134 L.Ed.2d 929 (1995); *see also Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508, 511 (7th Cir.1995); *Gercey v. United States*, 540 F.2d at 539. This exception provides that the United States does not waive sovereign immunity with respect to

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

 "The exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice,'

and 'it is the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (citations omitted). Its purpose is to " 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort....' " *Id.* at 323, 111 S.Ct. at 1273 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)). In *Gercey,* this Circuit noted that

> [w]ere there no such immunity for basic policy making decisions, all administrative and legislative decisions concerning the public interest in maritime matters would be subject to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries. That, in our view, would be an intolerable state of affairs....

*Gercey v. United States,* 540 F.2d at 539.

■ In order for the exception to apply, two requirements must be satisfied. First, the challenged act must have "involved an element of judgment or choice...." *Horta v. Sullivan,* 4 F.3d 2, 17 (1st Cir.1993). Second, the challenged act must be "based on considerations of public policy." *Id.; see also United States v. Gaubert,* 499 U.S. at 322–23, 111 S.Ct. at 1273–74.

■ While the existence and parameters of the discretionary function exception are well-established, the question of whether a plaintiff or the government has the burden of proving the applicability of the exception is unsettled. Three circuits have concluded that the plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA,[8] but that "the United States bears the ultimate burden of proving the applicability of the discretionary function exception." *Valdez v. United States,* 56 F.3d 1177, 1179 (9th Cir.1995) (citation and internal quotation marks omitted); *see also Carlyle v. United States,* 674 F.2d 554, 556 (6th Cir.1982); *Stewart v. United States,* 199 F.2d 517, 520

(7th Cir.1952). The Tenth and Eleventh Circuits, while not reaching a definitive conclusion, question the validity of this burden distribution scheme in light of the Supreme Court's decision in *Gaubert. See Autery v. United States,* 992 F.2d 1523, 1526 n. 6 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1829, 128 L.Ed.2d 458 (1994); *Kiehn v. United States,* 984 F.2d 1100, 1105 n. 7 (10th Cir.1993). The First Circuit, while recognizing the approach adopted by other circuits, *see Hydrogen Technology Corp. v. United States,* 831 F.2d 1155, 1162 n. 6 (1st Cir. 1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988), has not offered any clear precedent to be applied with respect to this issue.

Since there is no First Circuit precedent clearly to the contrary, this court will follow the lead of the Sixth, Seventh, and Ninth Circuits, and employ the burden shifting approach with respect to the invocation of the discretionary function exception. In so doing, this court is careful to note that the fact that the government bears the burden to establish the applicability of an FTCA exception in no way alters this court's ability to address the issue of jurisdiction sua sponte. Indeed, "[i]t is well-established law that ... jurisdictional defenses cannot be waived by the parties and may be raised ... by a court sua sponte." *Id.*

■ In this case, the defendant offered the testimony of Frank Moy in an effort to meet its burden. Moy is a civilian employee of the Naval Sea Systems Command Department of the Navy, and is a project manager for the procurement of boats and craft for the Navy. Moy's testimony focused primarily on the process by which the Navy procures its vessels.

The process of selecting or purchasing a particular ship—including the 841—for use by the United States Navy is well-defined. The Chief of Naval Operations determines what vessels will be needed as part of the national defense. He or she then consults with the Secretary of the Navy and the Secretary of Defense, and a request for the

---

8. This requires a plaintiff to plead matters that are facially outside of the FTCA exceptions. *See*

*Carlyle v. United States,* 674 F.2d 554, 556 (6th Cir.1982).

procurement of a vessel is thereafter submitted as part of the President's budget summit.

The budget is then submitted to Congress, which must provide the authorization and appropriation of funds for the procurement. If this is done, the funds are distributed to the Naval Sea Systems Command ("NAVSEA"), which prepares a solicitation with the specifications for the vessel to be procured. After receiving bids, NAVSEA awards a contract for the construction of the vessel.

Once the contract has been awarded, it is assigned to a NAVSEA field activity, referred to as the Supervisor of Shipbuilding, Conversion and Repair ("SUPSHIP"). Thereafter, SUPSHIP and NAVSEA work together with respect to the oversight and day-to-day administration of the contract. The Navy accepts delivery of the vessel upon its completion only if it was constructed in accordance with the plans the Navy provided to the contractor.

What is clear from Moy's testimony with respect to this procurement process—and plaintiff concedes as much in his post-trial memorandum—is that the act of selecting or approving a particular ship for use by the Navy involves an element of judgment or choice. *Cf. Baldassaro v. United States,* 64 F.3d at 209. However, the defendant has offered no evidence to suggest that the decisions concerning the specifications of procured vessels are discretionary. In other words, the defendant has not directed the court to any statutes, regulations, policies, guidelines, or standards that vest with the defendant the discretion to determine the specifics with respect to any appurtenance—including handholds—on the vessels procured. Thus, plaintiff is correct in his assertion that the defendant has failed to bear its burden of establishing the existence of the discretionary function exception. Since there is nothing to support the invocation of this exception sua sponte, this court finds that it has jurisdiction to consider the merits of plaintiff's unseaworthiness claim.

■■■■■■ It is well-settled that shipowners have a duty to furnish a seaworthy ship. *See Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 548–49, 80 S.Ct. 926, 931–33, 4 L.Ed.2d 941 (1960). "Shipowners are liable to indemnify seamen for injuries 'caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment.'" *McAleer v. Smith,* 57 F.3d at 112 (footnote omitted) (quoting *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 90, 66 S.Ct. 872, 875, 90 L.Ed. 1099 (1946)). In essence, unseaworthiness is a species of liability without fault. *See Seas Shipping Co. v. Sieracki,* 328 U.S. at 94, 66 S.Ct. at 877; *McAleer v. Smith,* 57 F.3d at 112.

■■■■ The doctrine of unseaworthiness does not require a shipowner to furnish an accident-free ship. *See Mitchell v. Trawler Racer, Inc.,* 362 U.S. at 550, 80 S.Ct. at 933. That is, a shipowner is not required to provide a ship that will weather every conceivable storm or withstand every imaginable peril of the sea. *See id.* Rather, a shipowner is obligated to furnish a vessel and appurtenances reasonably fit for their intended use. *See id.; Jordan v. United States Lines, Inc.,* 738 F.2d 48, 49 (1st Cir.1984).

Thus, the ultimate question to be answered with respect to this allegation is whether the defendant provided plaintiff with safe and suitable appliances with which to perform his work, as well as a safe place in which to use them. Plaintiff contends that members of the crew could not perform their duties safely—that is, ascend and descend the ladder—without the handhold. Once again, however, the testimony presented at trial belies this contention.

■■■■ Captain DuBois testified—and plaintiff seemingly agrees in his post-trial memorandum—that the accepted method at sea for climbing or moving through open spaces is to have three points of contact with the vessel: either one hand and two feet, or two hands and one foot. The testimony of numerous witnesses establishes that there were a sufficient number of objects in or around the doorway to allow seamen to maintain three points of contact at all times while passing through the doorway and down the ladder to the pump room. Specifically, the witnesses pointed to the handrails on either side of the ladder as well a number of "non-handrail specific" devices, including the door jam, a

beam, and a handwheel on an adjacent water-tight door.

This court finds that the configuration of the doorway was such that a seaman would be able to pass through the doorway and descend and ascend the ladder in a safe manner. Therefore, plaintiff's claim of unseaworthiness must fail. This court now turns to address plaintiff's remaining claim.

## C. Maintenance and Cure

▋ "From time immemorial, the law of the sea has required shipowners to ensure the maintenance and cure of seamen who fall ill or become injured while in service of the ship." *LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 396 (1st Cir.1993). "The shipowner's ancient duty ... derives from the 'unique hazards [which] attend the work of seamen,' and fosters the 'combined object of encouraging marine commerce and assuring the well-being of seamen.'" *Vella v. Ford Motor Co.*, 421 U.S. 1, 3–4, 95 S.Ct. 1381, 1383, 43 L.Ed.2d 682 (1975) (quoting *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943)). "The duty, which arises from the contract of employment, does not rest upon negligence or culpability on the part of the owner or master, nor is it restricted to those cases where the seaman's employment is the cause of the injury or illness." *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938) (citations omitted). Moreover, an "employer's responsibility for maintenance and cure extends beyond injuries sustained because of, or while engaged in, activities required by [his or her] employment." *Aguilar v. Standard Oil Co.*, 318 U.S. at 732, 63 S.Ct. at 934.

▋ Maintenance is a living allowance for a seaman while he or she is recovering from injury or illness. *See Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1079 (3d Cir.1995); *LeBlanc v. B.G.T. Corp.*, 992 F.2d at 397. Cure is an employer's obligation to pay for medical expenses for sick or injured seamen. *See Calmar S.S. Corp. v. Taylor*,

303 U.S. at 528, 58 S.Ct. at 653; *LeBlanc v. B.G.T. Corp.*, 992 F.2d at 397. The shipowner is required to pay maintenance and cure until the seaman is " 'so far cured as possible' "—that is, until the seaman is cured or his or her condition is diagnosed as permanent and incurable. *LeBlanc v. B.G.T. Corp.*, 992 F.2d at 397 (quoting *Farrell v. United States*, 336 U.S. 511, 518, 69 S.Ct. 707, 711, 93 L.Ed. 850 (1949)); *see also Deisler v. McCormack Aggregates, Co.*, 54 F.3d at 1079.

### 1. Injury in the Service of the Ship

▋ It is "common ground" that the right to maintenance and cure lies only with "seamen" who are "in service of the ship" at the time he or she sustains an injury or illness. *LeBlanc v. B.G.T. Corp.*, 992 F.2d at 397. In this case, there is no dispute as to whether plaintiff qualifies as a "seaman." [9] However, the defendant asserts that plaintiff fails to satisfy the second prerequisite for entitlement to maintenance and cure—that is, that he sustained his injuries while in the service of his ship. The defendant avers that plaintiff originally injured his back while on active duty with the United States Coast Guard in the late 1960's and early 1970's—an injury that eventually resulted in his discharge from the Coast Guard in 1973—and that he aggravated this condition while moving furniture on a day off.

▋ The defendant's argument fails to carry the day for a number of reasons. First, there was little evidence introduced to show that plaintiff's pre-existing condition impaired his abilities at any time prior to March 1991. Plaintiff testified that he was in the best physical shape of his life during the three years preceding the March 1991 voyage, regularly taking bicycle trips of twenty to thirty miles, as well as doing a good deal of swimming and running. This assertion is supported by the testimony of Danny Seyster,[10] who stated that plaintiff never exhibited any limitations with respect to his physical

---

**9.** The legal test for "seaman" status with respect to maintenance and cure is the same as the inquiry for standing under the Jones Act. *See Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1499 (5th Cir.1995), *cert. denied*, —— U.S.

——, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996). Neither party has suggested that plaintiff fails to qualify as such for either form of recovery.

**10.** Seyster served as First Mate aboard the 841.

abilities prior to March 1991, and confirmed plaintiff's testimony concerning the bicycle trips and swimming.

Second, plaintiff's injuries support a finding that they were sustained as a result of his fall. Plaintiff's orthopedic surgeon, Elie J. Cohen, provided detailed testimony via videotape about plaintiff's shoulder and back injuries. With respect to plaintiff's shoulder, Dr. Cohen testified that plaintiff "sustained a second-degree sprain of the right acromio-clavicular joint and a neurapraxia of the lower brachial plexus, which is a concussion type of the nerve, which recovered." Cohen Transcript, at 26–27. With respect to plaintiff's back, Dr. Cohen stated that plaintiff had suffered a herniated lumbar disk at L5–S1, which did not need surgery. *See id.* at 27.

These injuries comport with plaintiff's description of his fall. Plaintiff testified that as he fell, he struck his back and both shoulders on various portions of the ship—specifically, he recalled hitting his right shoulder on the rungs of the ladder. Further, Dr. Cohen testified that it was his opinion, to a reasonable degree of medical certainty, that plaintiff's shoulder and back injuries were caused by the fall on the 841. *See* Cohen Transcript, at 26–29.

It is clear from this testimony that plaintiff sustained his shoulder and back injuries when he fell down the ladder on the 841. Further, it is clear that this fall occurred during a time when plaintiff was in the service of his ship. Thus, the remaining questions concern the amount of maintenance and cure to which plaintiff is entitled.

### 2. *Maintenance*

■ The law of the proper amount of maintenance an injured seaman may collect is "anything but crystal clear...." *Ritchie v. Grimm,* 724 F.Supp. 59, 61 (E.D.N.Y. 1989). In the past, courts generally awarded $8.00 per day as maintenance to seamen. *See* SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6–32, at 359. Today, however, absent the inclusion of an agreed daily rate in a collective bargaining agreement negotiated by the seaman's union, the maintenance amount is "a factual determination based upon evidence of the seaman's actual expenditures for food and lodging." *Id.; see also*

*Macedo v. F/V Paul & Michelle,* 868 F.2d 519, 522 (1st Cir.1989).

■ Where no collective bargaining agreement exists to define the rate of maintenance and cure—and there is no evidence that one exists in this case—the "seaman must bring forth prima facie evidence of his expenses." SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6–32, at 359; *see also Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d 89, 95 (5th Cir.1985); *Ritchie v. Grimm,* 724 F.Supp. at 61. In other words, the seaman bears the burden of "present[ing] some evidence that [he or she] expended sums for food and lodging ashore which was the equivalent of that on the vessel." *Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d at 95. A seaman's own testimony as to expenses is sufficient to satisfy this burden. *See id.* at 94.

■ In this case, plaintiff failed to provide this court with any evidence of the food and lodging expenditures he incurred while recovering from his injury. Plaintiff did testify to the fact that at one time he expended approximately $300 per month to maintain a camper. However, plaintiff incurred this expense while he continued to work in his position as chief engineer on the 841 so that he would have a place for his daughter to visit; there is no evidence to suggest that this figure represented his lodging costs for any period of time thereafter. Moreover, the $300 figure is nothing more than an approximation on plaintiff's part—he admitted that he could not remember the actual amount of the expense incurred. Thus, although this court has found that plaintiff would otherwise be entitled to maintenance, he has failed to meet his burden of proving maintenance costs.

### 3. *Cure*

■ With respect to cure, plaintiff has submitted six bills representing the medical expenses he has incurred for treatment of his injuries. First, plaintiff submitted a bill representing the costs incurred for treatment by Dr. Cohen. The outstanding balance for Dr. Cohen's services is $474.20, consisting of charges for a number of office visits, x-rays,

and consultations.[11] Second, plaintiff submitted four bills representing expenses incurred for x-rays and treatment at the Newport County Emergency and Medical Treatment Office, Inc. on April 10, 1991, March 2, 1992, May 20, 1992, and December 28, 1993. The total of these expenditures is $438.00. Third, plaintiff submitted a bill for $737.00 from Newport Hospital, which apparently reflects the costs incurred for undergoing a Magnetic Resonance Imaging procedure.

 It should be noted that neither party addressed the issue of when, or if, plaintiff's condition reached the state of maximum cure, thus relieving the defendant of his obligation to provide maintenance and cure. Notwithstanding this fact, Dr. Cohen testified that plaintiff's present condition is "holding," but stated that he did not know when or if it might flare up again. Cohen Transcript, at 29. Based on this testimony, this court finds that plaintiff has reached the point of maximum cure.

Plaintiff has met his burden in proving entitlement to cure. The evidence presented supports the finding by this court that plaintiff is to be reimbursed in an amount equal to the aggregate of the medical bills submitted, $1,649.20.

### III. CONCLUSION

For the reasons stated above, plaintiff is entitled only to cure in the amount of $1,649.20. Judgment may enter for plaintiff in the amount of $1,649.20 plus interest and costs.

SO ORDERED.

---

**11.** The bill indicates that Dr. Cohen's total fees amounted to $975.00. However, the bill reflects the fact that Dr. Cohen received four payments totaling $500.80 from various insurance companies. Because of the well-established rule that seamen may recover only those expenses actually incurred, the collateral source rule is not strictly applied. *Moran Towing & Transp., Co. v. Lombas,* 58 F.3d 24, 27 (2d Cir.1995); SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6–32, at 362. Thus, the defendant is relieved of the obligation to pay that part of plaintiff's cure furnished by others at no expense to the seaman. *See Moran Towing & Transp., Co. v. Lombas,* 58 F.3d at 27.